# GILBERT *v.* CALIFORNIA.

No. 223.   Argued February 15–16, 1967.—Decided June 12, 1967.

*Luke McKissack* argued the cause and filed briefs for petitioner.

*Norman H. Sokolow,* Deputy Attorney General of California, and *William E. James,* Assistant Attorney General, argued the cause for respondent. With them on the brief was *Thomas C. Lynch,* Attorney General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case was argued with *United States* v. *Wade, ante,* p. 218, and presents the same alleged constitutional error in the admission in evidence of in-court identifications there considered. In addition, petitioner alleges con-

stitutional errors in the admission in evidence of testimony of some of the witnesses that they also identified him at the lineup, in the admission of handwriting exemplars taken from him after his arrest, and in the admission of out-of-court statements by King, a codefendant, mentioning petitioner's part in the crimes, which statements, on the co-defendant's appeal decided with petitioner's, were held to have been improperly admitted against the co-defendant. Finally, he alleges that his Fourth Amendment rights were violated by a police seizure of photographs of him from his locked apartment after entry without a search warrant, and the admission of testimony of witnesses that they identified him from those photographs within hours after the crime.

Petitioner was convicted in the Superior Court of California of the armed robbery of the Mutual Savings and Loan Association of Alhambra and the murder of a police officer who entered during the course of the robbery. There were separate guilt and penalty stages of the trial before the same jury, which rendered a guilty verdict and imposed the death penalty. The California Supreme Court affirmed, 63 Cal. 2d 690, 408 P. 2d 365. We granted certiorari, 384 U. S. 985, and set the case for argument with *Wade* and with *Stovall* v. *Denno, post,* p. 293. If our holding today in *Wade* is applied to this case, the issue whether admission of the in-court and lineup identifications is constitutional error which requires a new trial could be resolved on this record only after further proceedings in the California courts. We must therefore first determine whether petitioner's other contentions warrant any greater relief.

## I.

### THE HANDWRITING EXEMPLARS.

Petitioner was arrested in Philadelphia by an FBI agent and refused to answer questions about the Alham-

bra robbery without the advice of counsel. He later did answer questions of another agent about some Philadelphia robberies in which the robber used a handwritten note demanding that money be handed over to him, and during that interrogation gave the agent the handwriting exemplars. They were admitted in evidence at trial over objection that they were obtained in violation of petitioner's Fifth and Sixth Amendment rights. The California Supreme Court upheld admission of the exemplars on the sole ground that petitioner had waived any rights that he might have had not to furnish them. "[The agent] did not tell Gilbert that the exemplars would not be used in any other investigation. Thus, even if Gilbert believed that his exemplars would not be used in California, it does not appear that the authorities improperly induced such belief." 63 Cal. 2d, at 708, 408 P. 2d, at 376. The court did not, therefore, decide petitioner's constitutional claims.

We pass the question of waiver since we conclude that the taking of the exemplars violated none of petitioner's constitutional rights.

*First.* The taking of the exemplars did not violate petitioner's Fifth Amendment privilege against self-incrimination. The privilege reaches only compulsion of "an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers," and not "compulsion which makes a suspect or accused the source of 'real or physical evidence' . . . ." *Schmerber* v. *California,* 384 U. S. 757, 763-764. One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is

written, like the voice or body itself, is an identifying physical characteristic outside its protection. *United States* v. *Wade, supra,* at 222–223. No claim is made that the content of the exemplars was testimonial or communicative matter. Cf. *Boyd* v. *United States,* 116 U. S. 616.

*Second.* The taking of the exemplars was not a "critical" stage of the criminal proceedings entitling petitioner to the assistance of counsel. Putting aside the fact that the exemplars were taken before the indictment and appointment of counsel, there is minimal risk that the absence of counsel might derogate from his right to a fair trial. Cf. *United States* v. *Wade, supra.* If, for some reason, an unrepresentative exemplar is taken, this can be brought out and corrected through the adversary process at trial since the accused can make an unlimited number of additional exemplars for analysis and comparison by government and defense handwriting experts. Thus, "the accused has the opportunity for a meaningful confrontation of the [State's] case at trial through the ordinary processes of cross-examination of the [State's] expert [handwriting] witnesses and the presentation of the evidence of his own [handwriting] experts." *United States* v. *Wade, supra,* at 227–228.

## II.

### Admission of Co-Defendant's Statements.

Petitioner contends that he was denied due process of law by the admission during the guilt stage of the trial of his accomplice's pretrial statements to the police which referred to petitioner 159 times in the course of reciting petitioner's role in the robbery and murder. The statements were inadmissible hearsay as to petitioner, and were held on King's aspect of this appeal to be improperly obtained from him and therefore to be inadmissible against him under California law. 63 Cal. 2d, at 699–701, 408 P. 2d, at 370–371.

Petitioner would have us reconsider *Delli Paoli* v. *United States,* 352 U. S. 232 (where the Court held that appropriate instructions to the jury would suffice to prevent prejudice to a defendant from the references to him in a co-defendant's statement), at least as applied to a case, as here, where the co-defendant gained a reversal because of the improper admission of the statements. We have no occasion to pass upon this contention. The California Supreme Court has rejected the *Delli Paoli* rationale, and relying at least in part on the reasoning of the *Delli Paoli* dissent, regards cautionary instructions as inadequate to cure prejudice. *People* v. *Aranda,* 63 Cal. 2d 518, 407 P. 2d 265. The California court applied *Aranda* in this case but held that any error as to Gilbert in the admission of King's statements was harmless. The harmless-error standard applied was that "there is no reasonable possibility that the error in admitting King's statements and testimony might have contributed to Gilbert's conviction," a standard derived by the court from our decision in *Fahy* v. *Connecticut,* 375 U. S. 85.[1] *Fahy* was the basis of our holding in *Chapman* v. *California,* 386 U. S. 18, and the standard applied by the California court satisfies the standard as defined in *Chapman.*

It may be that the California Supreme Court will review the application of its harmless-error standard to King's statements if on the remand the State presses harmless error also in the introduction of the in-court and lineup identifications. However, this at best implies an ultimate application of *Aranda* and only confirms that petitioner's argument for reconsideration of *Delli Paoli* need not be considered at this time.

___

[1] The California Supreme Court also held that ". . . the erroneous admission of King's statements at the trial on the issue of guilt was not prejudicial on the question of Gilbert's penalty," again citing *Fahy,* 63 Cal. 2d, at 702, 408 P. 2d, at 372.

## III.

### THE SEARCH-AND-SEIZURE CLAIM.

The California Supreme Court rejected Gilbert's challenge to the admission of certain photographs taken from his apartment pursuant to a warrantless search. The court justified the entry into the apartment under the circumstances on the basis of so-called "hot pursuit" and "exigent circumstances" exceptions to the warrant requirement. We granted certiorari to consider the important question of the extent to which such exceptions may permit warrantless searches without violation of the Fourth Amendment. A closer examination of the record than was possible when certiorari was granted reveals that the facts do not appear with sufficient clarity to enable us to decide that question. See Appendix to this opinion; compare *Warden* v. *Hayden*, 387 U. S. 294. We therefore vacate certiorari on this issue as improvidently granted. *The Monrosa* v. *Carbon Black Export, Inc.*, 359 U. S. 180, 184.

## IV.

### THE IN-COURT AND LINEUP IDENTIFICATIONS.

Since none of the petitioner's other contentions warrants relief, the issue becomes what relief is required by application to this case of the principles today announced in *United States* v. *Wade, supra.*

Three eyewitnesses to the Alhambra crimes who identified Gilbert at the guilt stage of the trial had observed him at a lineup conducted without notice to his counsel in a Los Angeles auditorium 16 days after his indictment and after appointment of counsel. The manager of the apartment house in which incriminating evidence was found, and in which Gilbert allegedly resided, identified Gilbert in the courtroom and also testified, in substance, to her prior lineup identification on examination by the

State. Eight witnesses who identified him in the court-room at the penalty stage were not eyewitnesses to the Alhambra crimes but to other robberies allegedly committed by him. In addition to their in-court identifications, these witnesses also testified that they identified Gilbert at the same lineup.

The lineup was on a stage behind bright lights which prevented those in the line from seeing the audience. Upwards of 100 persons were in the audience, each an eyewitness to one of the several robberies charged to Gilbert. The record is otherwise virtually silent as to what occurred at the lineup.[2]

---

[2] The record in *Gilbert* v. *United States,* 366 F. 2d 923, involving the federal prosecutions of Gilbert, apparently contains many more details of what occurred at the lineup. The opinion of the Court of Appeals for the Ninth Circuit states, 366 F. 2d, at 935:

"The lineup occurred on March 26, 1964, after Gilbert had been indicted and had obtained counsel. It was held in an auditorium used for that purpose by the Los Angeles police. Some ten to thirteen prisoners were placed on a lighted stage. The witnesses were assembled in a darkened portion of the room, facing the stage and separated from it by a screen. They could see the prisoners but could not be seen by them. State and federal officers were also present and one of them acted as 'moderator' of the proceedings.

"Each man in the lineup was identified by number, but not by name. Each man was required to step forward into a marked circle, to turn, presenting both profiles as well as a face and back view, to walk, to put on or take off certain articles of clothing. When a man's number was called and he was directed to step into the circle, he was asked certain questions: where he was picked up, whether he owned a car, whether, when arrested, he was armed, where he lived. Each was also asked to repeat certain phrases, both in a loud and in a soft voice, phrases that witnesses to the crimes had heard the robbers use: 'Freeze, this is a stickup; this is a holdup; empty your cash drawer; this is a heist; don't anybody move.'

"Either while the men were on the stage, or after they were taken from it, it is not clear which, the assembled witnesses were asked if there were any that they would like to see again, and told that if they had doubts, now was the time to resolve them. Several

At the guilt stage, after the first witness, a cashier of the savings and loan association, identified Gilbert in the courtroom, defense counsel moved, out of the presence of the jury, to strike her testimony on the ground that she identified Gilbert at the pretrial lineup conducted in the absence of counsel in violation of the Sixth Amendment made applicable to the States by the Fourteenth Amendment. *Gideon* v. *Wainwright,* 372 U. S. 335. He requested a hearing outside the presence of the jury to present evidence supporting his claim that her in-court identification was, and others to be elicited by the State from other eyewitnesses would be, "predicated at least in large part upon their identification or purported identification of Mr. Gilbert at the showup . . . ." The trial judge denied the motion as premature. Defense counsel then elicited the fact of the cashier's lineup identification on cross-examination and again moved to strike her identification testimony. Without passing on the merits of the Sixth Amendment claim, the trial judge denied the motion on the ground that, assuming a violation, it would not in any event entitle Gilbert to suppression of the in-court identification. Defense counsel thereafter elicited the fact of lineup identifications from two other eyewitnesses who on direct examination identified Gilbert in the courtroom. Defense counsel unsuccessfully objected at the penalty stage, to the testimony of the eight witnesses to the other robberies that they identified Gilbert at the lineup.

---

gave the numbers of men they wanted to see, including Gilbert's. While the other prisoners were no longer present, Gilbert and 2 or 3 others were again put through a similar procedure. Some of the witnesses asked that a particular prisoner say a particular phrase, or walk a particular way. After the lineup, the witnesses talked to each other; it is not clear that they did so during the lineup. They did, however, in each other's presence, call out the numbers of men they could identify."

The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error. *United States* v. *Wade, supra.* We there held that a post-indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at trial of the in-court identifications of the accused by witnesses who attended the lineup. However, as in *Wade,* the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error.

Quite different considerations are involved as to the admission of the testimony of the manager of the apartment house at the guilt phase and of the eight witnesses at the penalty stage that they identified Gilbert at the lineup.[3] That testimony is the direct result of the illegal

---

[3] There is a split among the States concerning the admissibility of prior extrajudicial identifications, as independent evidence of identity, both by the witness and third parties present at the prior identification. See 71 ALR 2d 449. It has been held that the prior identification is hearsay, and, when admitted through the testimony of the identifier, is merely a prior consistent statement. The recent trend, however, is to admit the prior identification under the exception that admits as substantive evidence a prior communication by a witness who is available for cross-examination at trial. See 5 ALR 2d Later Case Service 1225–1228. That is the Cali-

lineup "come at by exploitation of [the primary] illegality." *Wong Sun* v. *United States,* 371 U. S. 471, 488. The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup. In the absence of legislative regulations adequate to avoid the hazards to a fair trial which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence. Cf. *Mapp* v. *Ohio,* 367 U. S. 643. That conclusion is buttressed by the consideration that the witness' testimony of his lineup identification will enhance the impact of his in-court identification on the jury and

---

fornia rule. In *People* v. *Gould,* 54 Cal. 2d 621, 626, 354 P. 2d 865, 867, the Court said:

"Evidence of an extrajudicial identification is admissible, not only to corroborate an identification made at the trial (*People* v. *Slobodion,* 31 Cal. 2d 555, 560 [191 P. 2d 1]), but as independent evidence of identity. Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached . . . evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. . . . The failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances. The extrajudicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination."

New York deals with the subject in a statute. See N. Y. Code Crim. Proc. § 393–b.

seriously aggravate whatever derogation exists of the accused's right to a fair trial. Therefore, unless the California Supreme Court is "able to declare a belief that it was harmless beyond a reasonable doubt," *Chapman* v. *California*, 386 U. S. 18, 24, Gilbert will be entitled on remand to a new trial or, if no prejudicial error is found on the guilt stage but only in the penalty stage, to whatever relief California law affords where the penalty stage must be set aside.

The judgment of the California Supreme Court and the conviction are vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE joins this opinion except for Part III, from which he dissents for the reasons expressed in the opinion of MR. JUSTICE DOUGLAS.

## APPENDIX TO OPINION OF THE COURT.

Photographs of Gilbert introduced at the guilt stage of the trial had been viewed by eyewitnesses within hours after the robbery and murder. Officers had entered his apartment without a warrant and found them in an envelope on the top of a bedroom dresser. The envelope was of the kind customarily used in delivering developed prints, with the words "Marlboro Photo Studio" imprinted on it. The officers entered the apartment because of information given by an accomplice which led them to believe that one of the suspects might be inside the apartment. Assuming that the warrantless entry into the apartment was justified by the need immediately to search for the suspect, the issue remains whether the subsequent search was reasonably supported by those same exigent circumstances. If the envelope

were come upon in the course of a search for the suspect, the answer might be different from that where it is come upon, even though in plain view, in the course of a general, indiscriminate search of closets, dressers, etc., after it is known that the occupant is absent. Still different considerations may be presented where officers, pursuing the suspect, find that he is absent from the apartment but conduct a limited search for suspicious objects in plain view which might aid in the pursuit. The problem with the record in the present case is that it could reasonably support any of these factual conclusions upon which our constitutional analysis should rest, and the trial court made no findings on the scope of search. The California Supreme Court, which had no more substantial basis upon which to resolve the conflict than this Court, stated that the photos were come upon "while the officers were looking through the apartment for their suspect . . . ." As will appear, a contrary conclusion is equally reasonable.

(1) Agent Schlatter testified that immediately upon entering the apartment which he put at "approximately 1:05," the officers made a quick search for the occupant, which took at most a minute, and that the continued presence of the officers became "a matter of a stake-out under the assumption that the person or persons involved would come back." He testified that the officer who found the photographs, Agent Crowley, had entered the apartment with him. Agent Schlatter's testimony might support the California Supreme Court's view of the scope of search; (2) Agent Crowley testified that he arrived within five minutes *after* Agent Schlatter, "around 1:30, give or take a few minutes either way," that the apartment had already been searched for the suspects, and that he was instructed "to look through the apartment for anything we could find that we could use to identify or continue the pursuit of this person

without conducting a detailed search." Crowley's further testimony was that the search, pursuant to which the photos were found, was limited in this manner, and that he merely inspected objects in plain sight which would aid in identification. He stated that a detailed search for guns and money was not conducted until after a warrant had issued over three hours later. (3) Agent Townsend said he arrived at the apartment "sometime between perhaps 1:30 and 2:00," and that "well within an hour" he, Agent Crowley, another agent and a local officer conducted a detailed search of the bedroom. He stated that they "looked through the bedroom closet and dresser and I think . . . the headstand." A substantial sum of money was found in the dresser. Townsend could not "specifically say" whether Crowley was in the bedroom at the time the money was found. This testimony might support a finding that the officers were engaged in a general search of the bedroom at the time the photos were found.

The testimony of the agents concerning their time of arrival in the apartment is not inconsistent with any of the three possible conclusions as to the scope of search. Taking Townsend's testimony together with Crowley's, it can be concluded that the two arrived at about the same time. Agent Schlatter's testimony that Crowley arrived with him at 1:05, however, supports a conclusion that Crowley had begun his activities before Townsend arrived. Then there is the testimony of Agent Kiel, who did not enter the apartment, that he obtained the photos while talking with the landlady "approximately 1:25 to 1:30," about the same time that both Crowley and Townsend testified they arrived. In sum, the testimony concerning the timing of the events surrounding the search is both approximate and itself contradictory.

MR. JUSTICE BLACK, concurring in part and dissenting in part.

Petitioner was convicted of robbery and murder partially on the basis of handwriting samples he had given to the police while he was in custody without counsel and partially on evidence that he had been identified by eyewitnesses at a lineup identification ceremony held by California officers in a Los Angeles auditorium without notice to his counsel. The Court's opinion shows that the officers took Gilbert to the auditorium while he was a prisoner, formed a lineup of Gilbert and other persons, required each one to step forward, asked them certain questions, and required them to repeat certain phrases, while eyewitnesses to this and other crimes looked at them in efforts to identify them as the criminals. At his trial, Gilbert objected to the handwriting samples and to the identification testimony given by witnesses who saw him at the auditorium lineup on the ground that the admission of this evidence would violate his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel. It is well-established now that the Fourteenth Amendment makes both the Self Incrimination Clause of the Fifth Amendment and the Right to Counsel Clause of the Sixth Amendment obligatory on the States. See, *e. g., Malloy* v. *Hogan,* 378 U. S. 1; *Gideon* v. *Wainwright,* 372 U. S. 335.

## I.

(a) Relying on *Schmerber* v. *California,* 384 U. S. 757, the Court rejects Gilbert's Fifth Amendment contention as to both the handwriting exemplars and the lineup identification. I dissent from that holding. For reasons set out in my separate opinion in *United State* v. *Wade, ante,* p. 243, as well as in my dissent to *Schmerber,* 384 U. S., at 773, I think that case wholly unjustifiably detracts from the protection against compelled self-incrimination

the Fifth Amendment was designed to afford. It rests on the ground that compelling a suspect to submit to or engage in conduct the sole purpose of which is to supply evidence against himself nonetheless does not compel him to be a witness against himself. Compelling a. suspect or an accused to be "the source of 'real or physical evidence' . . . ," so says *Schmerber,* 384 U. S., at 764, is not compelling him to be a witness against himself. Such an artificial distinction between things that are in reality the same is in my judgment wholly out of line with the liberal construction which should always be given to the Bill of Rights. See *Boyd* v. *United States,* 116 U. S. 616.

(b) The Court rejects Gilbert's right-to-counsel contention in connection with the handwriting exemplars on the ground that the taking of the exemplars "was not a 'critical' stage of the criminal proceedings entitling petitioner to the assistance of counsel." In all reality, however, it was one of the most "critical" stages of the government proceedings that ended in Gilbert's conviction. As to both the State's case and Gilbert's defense, the handwriting exemplars were just as important as the lineup and perhaps more so, for handwriting analysis, being, as the Court notes, "scientific" and "systematized," *United States* v. *Wade, ante,* at 227, may carry much more weight with the jury than any kind of lineup identification. The Court, however, suggests that absence of counsel when handwriting exemplars are obtained will not impair the right of cross-examination at trial. But just as nothing said in our previous opinions "links the right to counsel only to protection of Fifth Amendment rights," *United States* v. *Wade, ante,* at 226, nothing has been said which justifies linking the right to counsel only to the protection of other Sixth Amendment rights. And there is nothing in the Constitution to justify considering the right to counsel as a second-

class, subsidiary right which attaches only when the Court deems other specific rights in jeopardy. The real basis for the Court's holding that the stage of obtaining handwriting exemplars is not "critical," is its statement that "there is minimal risk that the absence of counsel might derogate from his right to a fair trial." The Court considers the "right to a fair trial" to be the overriding "aim of the right to counsel," *United States* v. *Wade, ante,* at 226, and somehow believes that this Court has the power to balance away the constitutional guarantee of right to counsel when the Court believes it unnecessary to provide what the Court considers a "fair trial." But I think this Court lacks constitutional power thus to balance away a defendant's absolute right to counsel which the Sixth and Fourteenth Amendments guarantee him. The Framers did not declare in the Sixth Amendment that a defendant is entitled to a "fair trial," nor that he is entitled to counsel on the condition that this Court thinks there is more than a "minimal risk" that without a lawyer his trial will be "unfair." The Sixth Amendment settled that a trial without a lawyer is constitutionally unfair, unless the court-created balancing formula has somehow changed it. *Johnson* v. *Zerbst,* 304 U. S. 458, and *Gideon* v. *Wainwright,* 372 U. S. 335, I thought finally established the right of an accused to counsel without balancing of any kind.

The Court's holding here illustrates the danger to Bill of Rights guarantees in the use of words like a "fair trial" to take the place of the clearly specified safeguards of the Constitution. I think it far safer for constitutional rights for this Court to adhere to constitutional language like "the accused shall . . . have the Assistance of Counsel for his defence" instead of substituting the words not mentioned, "the accused shall have the assistance of counsel only if the Supreme Court thinks it necessary to assure a fair trial." In my judgment the guarantees

of the Constitution with its Bill of Rights provide the kind of "fair trial" the Framers sought to protect. Gilbert was entitled to have the "assistance of counsel" when he was forced to supply evidence for the Government to use against him at his trial. I would reverse the case for this reason also.

## II.

I agree with the Court that Gilbert's case should not be reversed for state error in admitting the pretrial statements of an accomplice which referred to Gilbert. But instead of squarely rejecting petitioner's reliance on the dissent in *Delli Paoli* v. *United States,* 352 U. S. 232, 246, the Court avoids the issue by pointing to the fact that the California Supreme Court, even assuming the error to be a federal constitutional one, applied a harmless-error test which measures up to the one we subsequently enunciated in *Chapman* v. *California,* 386 U. S. 18. And the Court then goes on to suggest that the California Supreme Court may desire to reconsider whether that is so upon remand.

I think the Court should clearly indicate that neither *Delli Paoli* nor *Chapman* has any relevance here. *Delli Paoli* rested on the admissibility of evidence in federal, not state, courts. The introduction of evidence in state courts is exclusively governed by state law unless its introduction would violate some federal constitutional provision and there is no such federal provision here. See *Spencer* v. *Texas,* 385 U. S. 554. That being so, any error in admitting the accomplice's pretrial statements is only an error of state law, and *Chapman,* providing a federal constitutional harmless-error rule, has absolutely no relevance here. Instead of looking at the harmless-error test applied by the California Supreme Court in order to ascertain whether it comports with *Chapman,* I would make it clear that this Court is leaving to the

States their unbridled power to control their own state courts in the absence of conflicting federal constitutional provisions.

### III.

One witness who identified Gilbert at the guilt stage of his trial and eight witnesses who identified him at the penalty stage testified on direct examination that they had identified him in the auditorium lineup. I agree with the Court that the admission of this testimony was constitutional error and that Gilbert is entitled to a new trial unless the state courts, applying *Chapman,* conclude that this error was harmless. However, these witnesses also identified Gilbert in the courtroom and two other witnesses at the guilt stage identified him solely in the courtroom. As to these, the Court holds that "[t]he admission of the in-court identifications without first determining that they were not tainted by the illegal lineup . . . was constitutional error." I dissent from this holding in this case and in *United States* v. *Wade, ante,* p. 243, for the reasons there given.

For the reasons here stated, I would vacate the judgment of the California Supreme Court and remand for consideration of whether the admission of the handwriting exemplars and the out-of-court lineup identification was harmless error.*

MR. JUSTICE DOUGLAS, concurring in part and dissenting in part.

While I agree with the Court's opinion except for Part I,† I would reverse and remand for a new trial on

---

*The Court dismisses as improvidently granted the Fourth Amendment search-and-seizure question raised by Gilbert in this case. I dissent from this, because I would decide that question against Gilbert. However, since the Court refuses to decide that question, I see no reason for expressing my views at length.

† On that phase of the case I agree with MR. JUSTICE BLACK and MR. JUSTICE FORTAS.

the search and seizure point. The search of the petitioner's home is sought to be justified by the doctrine of "hot pursuit," even though the officers conducting the search knew that petitioner, the suspected criminal, was not at home.

At about 10:30 a. m. on January 3, 1964, a California bank was robbed by two armed men; a police officer was killed by one of the robbers. Another officer shot one of the robbers, Weaver, who was captured a few blocks from the scene of the crime. Weaver told the police that he had participated in the robbery and that a person known to him as "Skinny" Gilbert was his accomplice. He told the officers that Gilbert lived in Apartment 28 of "a Hawaiian sounding named apartment house" on Los Feliz Boulevard. This information was given to the Federal Bureau of Investigation and was broadcast to a field agent, Kiel, who was instructed to find the apartment. Kiel located the "Lanai," an apartment on Los Feliz Boulevard, at about 1 p. m., informed the radio control, and engaged the apartment manager in conversation. While they were talking, a man gave a key to the manager and told her that he was going to San Francisco for a few days. Agent Kiel learned from the manager that Flood, one of the two men who had rented Apartment 28 the previous day, was the man who had just turned in the key and left by the rear exit. The agent ran out into the alleyway but saw no one.

In the meantime, the federal officers learned from Weaver that Gilbert was registered under the name of Flood. They also learned that three men may have been involved in the robbery—the two who entered the bank and a third driving the getaway car. About 1:10 p. m., additional federal agents arrived at the apartment, in response to Agent Kiel's radio summons. Kiel told them that the resident of Apartment 28 was a Robert Flood who had just left. The agents obtained a key from the

manager, entered the apartment and searched for a person or a hiding place for a person. They found no one. But they did find an envelope containing pictures of petitioner; the pictures were seized and shown to bank employees for identification. The agents also found a notebook containing a diagram of the area surrounding the bank, a clip from an automatic pistol, and a bag containing rolls of coins bearing the marking of the robbed bank. On the basis of this information, a search warrant was issued, and the automatic clip, notebook, and coin rolls were seized. Petitioner was arrested in Pennsylvania on February 26. The items seized during the search of his apartment were introduced in evidence at his trial for murder.

The California Supreme Court justified the search on the ground that the police were in hot pursuit of the suspected bank robbers. The entry of the apartment was lawful. The subsequent search and seizure was lawful since the officers were trying to further identify suspects and to facilitate continued pursuit. 63 Cal. 2d 690, 408 P. 2d 365.

I have set forth the testimony relating to the search more fully in the Appendix to this opinion. For the reasons stated there, I cannot agree that "the facts do not appear with sufficient clarity to enable us to decide" the serious question presented.

Since the search and seizure took place without a warrant, it can stand only if it comes within one of the narrowly defined exceptions to the rule that a search and seizure must rest upon a validly executed search warrant. See, e. g., United States v. Jeffers, 342 U. S. 48, 51; Jones v. United States, 357 U. S. 493; Rios v. United States, 364 U. S. 253, 261; Stoner v. California, 376 U. S. 483, 486. One of these exceptions is that officers having probable cause to arrest may enter a dwelling to make the arrest and conduct a contemporaneous

search of the place of arrest "in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody." *Agnello* v. *United States,* 269 U. S. 20, 30. This, of course, assumes that an arrest has been made, and that the search "is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Stoner* v. *California, supra,* at 486. In this case, the exemption is not applicable since the arrest was made many days after the search and at a location far removed from the search.

Here, the officers entered the apartment, searched for petitioner and did not find him. Nevertheless, they continued searching the apartment and seized the pictures; the inescapable conclusion is that they were searching for evidence linking petitioner to the bank robbery, not for the suspected robbers. The court below said that, having legally entered the apartment, the officers "could properly look through the apartment for anything that could be used to identify the suspects or to expedite the pursuit." 63 Cal. 2d, at 707, 408 P. 2d, at 375.

Prior to this case, police could enter and search a house without a warrant only incidental to a valid arrest. If this judgment stands, the police can search a house for evidence, even though the suspect is not arrested. The purpose of the search is, in the words of the California Supreme Court, "limited to and incident to the purpose of the officers' entry"—that is, to apprehend the suspected criminal. Under that doctrine, the police are given license to search for any evidence linking the homeowner with the crime. Certainly such evidence is well calculated "to identify the suspects," and will "expedite the pursuit" since the police can then concentrate on the person whose home has been ransacked. *Ibid.*

The search and seizure in this case violates another limitation, which concededly the ill-starred decision in *Harris* v. *United States,* 331 U. S. 145, flouted, *viz.,* that a general search for evidence, even when the police are in "hot pursuit" or have a warrant of arrest, does not make constitutional a general search of a room or of a house (*United States* v. *Lefkowitz,* 285 U. S. 452, 463–464). If it did, then the police, acting without a search warrant, could search more extensively than when they have a warrant. For the warrant must, as prescribed by the Fourth Amendment, "particularly" describe the "things to be seized." As stated by the Court in *United States* v. *Lefkowitz, supra,* at 464:

> "The authority of officers to search one's house or place of business contemporaneously with his lawful arrest therein upon a valid warrant of arrest certainly is not greater than that conferred by a search warrant issued upon adequate proof and sufficiently describing the premises and the things sought to be obtained. Indeed, the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests. Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime."

Indeed, if at the very start, there had been a search warrant authorizing the seizure of the automatic clip, notebook, and coin rolls, the envelope containing pictures of petitioner could not have been seized. "The requirement that warrants shall particularly describe the things

to be seized . . . prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron* v. *United States,* 275 U. S. 192, 196.

The modern police technique of ransacking houses, even to the point of seizing their entire contents as was done in *Kremen* v. *United States,* 353 U. S. 346, is a shocking departure from the philosophy of the Fourth Amendment. For the kind of search conducted here was indeed a general search. And if the Fourth Amendment was aimed at any particular target it was aimed at that. When we take that step, we resurrect one of the deepest-rooted complaints that gave rise to our Revolution. As the Court stated in *Boyd* v. *United States,* 116 U. S. 616, 625:

> "The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book'; since they placed 'the liberty of every man in the hands of every petty officer.' This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' "

I would not allow the general search to reappear on the American scene.

## APPENDIX TO OPINION OF
## MR. JUSTICE DOUGLAS.

As the Court notes, there is some confusion in the record respecting the timing of events surrounding the search and the breadth of purpose with which the search was conducted. The confusion results from the testimony of the agents involved.

Agent Kiel testified that Agents Schlatter and Onsgaard arrived at the apartment at about 1:10 and entered the apartment a minute or two after their arrival. Kiel received the photographs from Agent Schlatter between 1:25 and 1:30.

Agent Schlatter testified that he, Agent Onsgaard and some local police arrived at the apartment about 1:05 and that Agent Crowley and one or two local police officers arrived in another car at the same time. Schlatter briefly talked to Kiel and the apartment manager and then entered the apartment. Upon entering he saw no one. He "made a very fast search of the apartment for a person or a hiding place of a person and . . . found none." This search took "a matter of seconds or a minute at the outside" and "[a]fter we had searched for [a] person or persons, and no one was there, it then became a matter of a stake-out under the assumption that the person or persons involved would come back." It seemed to Schlatter that "an agent had [the photograph] in his hand," when he first saw it, that it "was in the hands of an agent or an officer," and Schlatter had "a vague recollection that [the agent or officer told him he had found it] in the bedroom . . . ." There were a number of photographs. Schlatter took the photographs out to Kiel and instructed him to take one of them to the savings and loan association and see if anyone there could recognize the photograph. Schlatter testified that he was in the apartment for about 30 minutes after making the search and left other agents behind when he left.

Agent Crowley testified that he entered the apartment "around 1:30, give or take a few minutes either way" and that he would say that the other officers had been in the apartment less than five minutes before he entered. He believed that "the officers and the other agent who had been with [him] at the rear of the building when the first entry was made, entered with [him]." When Crowley entered the apartment it "had already been searched for people." He received "instructions . . . to look through the apartment for anything we could find that we could use to identify or continue the pursuit of this person without conducting a detailed search." In the bedroom, on the dresser, Crowley saw an envelope bearing the name "Marlboro Photo Studio"; it appeared to him to be an envelope containing photos and he could see that there was something inside. Crowley opened the envelope and saw several copies of photographs. He discussed the matter with "Onsgaard who was in charge in the building and he instructed [Crowley] to give it to another agent for him to utilize in pursuing the investigation, and [he was] reasonably certain that that agent was·Mr. Schlatter." This was about 1:30 according to Crowley. In the course of his search which turned up the photographs, Crowley "turned over [items] to see what was on the reverse, such as business cards, sales slips from local stores, that sort of item which might have been folded and would appear to possibly contain information of value to pursuit." He relayed the information obtained in this manner to the man coordinating the operation. Crowley remained in the apartment until the next morning.

Agent Townsend testified that he arrived at the apartment "[s]ometime between perhaps 1:30 and 2:00." Within an hour of his arrival, he began a search. Townsend testified that he, Agent Crowley, another agent and a local officer "looked through the bedroom closet and

the dresser and I think the headstand." This was after it was known that no one, other than agents and police officers, was in the apartment. Townsend stated that the agents and officers were "[i]n and out of the bedroom," that he found money in the bedroom dresser about an hour after he arrived in the apartment, and that he could not "say specifically" whether Crowley was there at that time.

Thus, there is some conflict regarding the times at which the events took place and with respect to the nature of the searches conducted by the various officers. The way I read the record, however, it is not in such a state "that the facts do not appear with sufficient clarity to enable us to decide" the question presented. Crowley's testimony that he came upon the photographs while searching "for anything . . . that we could use to identify or continue the pursuit" stands uncontradicted, as does his testimony that the apartment had already been searched for a person prior to his search uncovering the photographs. Schlatter's testimony that the operation "became a matter of a stake-out" after the unsuccessful search for a person does not contradict Crowley's testimony. A search for identifying evidence is certainly compatible with a "stake-out." And Crowley best knew what he was doing when he discovered the photographs. Nor does Townsend's testimony that he and others, perhaps including Crowley, conducted a detailed search conflict with Crowley's testimony. First, the record indicates that the detailed search was conducted after the photographs had been found. According to the testimony of Kiel and Schlatter, Schlatter gave the photographs to Kiel at about 1:30; according to Townsend, he arrived sometime between 1:30 and 2. Second, even if the detailed search took place before Crowley found the photographs and Crowley participated in that search, that does not indicate that Crowley's search which turned

up the photographs was more limited than Crowley claimed. If anything, it would indicate that his search was more general than he stated. Finally, Townsend's testimony as to the general search does not conflict with Schlatter's testimony that the operation became a "stake-out" after the suspect was not found. As I have said, a "stake-out" does not preclude a detailed search for evidence. And, the record indicates that Schlatter was not in the apartment when Townsend and the others conducted the detailed search.

The way I read the record, the photographs were discovered in the course of a general search for evidence. But even if Crowley is not believed and his testimony relating to the nature of his search is thrown out and it is simply assumed that he came upon the envelope in the course of a search for the suspect, there was no reason to pry into the envelope and seize the pictures—other than to obtain evidence. An envelope would contain neither the suspect nor the weapon.

MR. JUSTICE WHITE, whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, concurring in part and dissenting in part.

I concur in Parts I, II, and III of the Court's opinion, but for the reasons stated in my separate opinion in *United States* v. *Wade, ante,* p. 250, I dissent from Part IV of the Court's opinion and would therefore affirm the judgment of the Supreme Court of California.

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.

I concur in the result—the vacation of the judgment of the California Supreme Court and the remand of the case—but I do not believe that it is adequate. I would reverse and remand for a new trial on the additional ground that petitioner was entitled by the Sixth and

Fourteenth Amendments to be advised that he had a right to counsel before and in connection with his response to the prosecutor's demand for a handwriting exemplar.

1. The giving of a handwriting exemplar is a "critical stage" of the proceeding, as my Brother BLACK states. It is a "critical stage" as much as is a lineup. See *United States* v. *Wade, ante,* p. 218. Depending upon circumstances, both may be inoffensive to the Constitution, totally fair to the accused, and entirely reliable for the administration of justice. On the other hand, each may be constitutionally offensive, totally unfair to the accused, and prejudicial to the ascertainment of truth. An accused whose handwriting exemplar is sought needs counsel: Is he to write "Your money or your life?" Is he to emulate the holdup note by using red ink, brown paper, large letters, etc.? Is the demanded handwriting exemplar, in effect, an inculpation—a confession? Cf. the eloquent arguments as to the need for counsel, in the Court's opinion in *United States* v. *Wade, supra.*

2. The Court today appears to hold that an accused may be compelled to give a handwriting exemplar. Cf. *Schmerber* v. *California,* 384 U. S. 757 (1966). Presumably, he may be punished if he adamantly refuses. Unlike blood, handwriting cannot be extracted by a doctor from an accused's veins while the accused is subjected to physical restraint, which *Schmerber* permits. So presumably, on the basis of the Court's decision, trial courts may hold an accused in contempt and keep him in jail—indefinitely—until he gives a handwriting exemplar.

This decision goes beyond *Schmerber.* Here the accused, in the absence of any warning that he has a right to counsel, is compelled to cooperate, not merely to submit; to engage in a volitional act, not merely to suffer the inevitable consequences of arrest and state custody; to take affirmative action which may not merely identify

him, but tie him directly to the crime. I dissented in *Schmerber*. For reasons stated in my separate opinion in *United States* v. *Wade, supra,* I regard the extension of *Schmerber* as impermissible.

In *Wade,* the accused, who is compelled to utter the words used by the criminal in the heat of his act, has at least the comfort of counsel—even if the Court denies that the accused may refuse to speak the words—because the compelled utterance occurs in the course of a lineup. In the present case, the Court deprives him of even this source of comfort and whatever protection counsel's ingenuity could provide in face of the Court's opinion. This is utterly insupportable, in my respectful opinion. This is not like fingerprinting, measuring, photographing—or even blood-taking. It is a process involving the use of discretion. It is capable of abuse. It is in the stream of inculpation. Cross-examination can play only a limited role in offsetting false inference or misleading coincidence from a "stacked" handwriting exemplar. The Court's reference to the efficacy of cross-examination in this situation is much more of a comfort to an appellate court than a source of solace to the defendant and his counsel.

3. I agree with the Court's condemnation of the lineup identifications here and the consequent in-court identifications, and I join in this part of its opinion. I would also reverse and remand for a new trial because of the use of the handwriting exemplars which were unconstitutionally obtained in the absence of advice to the accused as to the availability of counsel. I could not conclude that the violation of the privilege against self-incrimination implicit in the facts relating to the exemplars was waived in the absence of advice as to counsel. *In re Gault,* 387 U. S. 1, 41–42 (1967); *Miranda* v. *Arizona,* 384 U. S. 436 (1966).