No. 45,775

THE STATE OF KANSAS, *Appellee,* v. RICHARD ARMSTRONG, *Appellant.*
(486 P. 2d 1322)

Opinion filed July 16, 1971.

*Gerald W. Scott,* of Wichita, argued the cause and was on the brief for the appellant.

*Ted L. Peters,* Deputy County Attorney, argued the cause, and *Vern Miller,* Attorney General, *Keith Sanborn,* County Attorney, and *Reese Jones,* Assistant County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: The defendant, Richard Armstrong, was charged in separate informations with two unconnected armed robberies, the first occurring at the Shopeze Market on November 9, 1968, and the second on November 14, 1968, at the Star Market. The charges were consolidated for trial and the defendant was convicted of both offenses. Motions for new trial were overruled and Mr. Armstrong was sentenced to terms of not less than ten nor more than twenty-one years on each charge, the sentences to run consecutively. This appeal followed.

A number of points are raised and will be discussed in order. Since no claim is made that the evidence was insufficient to support the verdicts, no attempt will be made at this time to summarize the testimony, although reference will later be made to such parts of the evidence as appear pertinent.

Much of the evidence against the defendant came from eye-witnesses, two of whom had attended two pretrial lineups, and the defendant's first claim of error is directed against the in-court identification of these witnesses. The claim is based primarily on the recent cases of *United States v. Wade,* 388 U. S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 and *Gilbert v. California,* 388 U. S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951.

The gist of those decisions is simply this: A pretrial lineup is a critical point in the accusatory process, and a stage at which an accused is entitled to be represented by counsel, absent an intelligent and voluntary waiver; where counsel was not present, and his presence was not waived, evidence of an out-of-court identification made at a lineup is not admissible to bolster a later in-court

identification, nor is the in-court identification itself admissible unless it be shown to have had an independent source or origin. (See *Pearson v. United States,* 389 F. 2d 684.)

While this court has recognized the rule espoused by the Wade-Gilbert twins, we have not heretofore been confronted with the precise factual situation obtaining here.

Two lineups were held in this case, the first on November 15, the day after the second robbery, and the second lineup four days later, on November 19. The two eye witnesses, Mr. Stone, manager of the Star Market, and Mr. Rhoten, operator of Shopeze, identified the defendant at the second lineup. The defendant objected to the identification testimony of both witnesses and requested out-of-court hearings thereon for the asserted reason that the lineups were illegal, in the absence of counsel. The objections were peremptorily overruled without argument, and both men identified Mr. Armstrong as being one of the robbers.

When the motion for new trial was heard, the defendant renewed his objections to the lineups, whereupon the state announced that counsel had been waived and a written waiver, signed by Armstrong, was thereupon introduced for the first time. The waiver contained no reference to the defendant having been advised concerning appointment of counsel should he be unable to provide his own, and the testimony of detective Shackelford, who secured the waiver, was ambiguous at best as to whether he was advised in such regard.

At the conclusion of Shackelford's testimony supporting the waiver, defense counsel advised the court that he wished to present his client's testimony to the effect he was not offered appointed counsel to assist him in the lineup but, to the contrary, was told he could not have counsel appointed. The trial court ruled that such testimony would be inadmissible, and rejected the defendant's offer of proof.

In our view, the proffered testimony was relevant on the issue of waiver. The instrument signed by Mr. Armstrong contained no mention of any right to appointed counsel at the lineup, a stage in the criminal process which both *Wade* and *Gilbert* declared to be critical. Moreover, an impartial appraisal of detective Shackelford's testimony tends to confirm the defendant's assertion that he was not advised in regard to appointment of counsel.

Under circumstances such as these, the defendant should have been permitted to testify. The issue before the court was whether

Armstrong had waived his right to appointed counsel. This, in turn, depended on whether the written waiver had been intelligently and understandingly given. (*Lloyd v. State*, 197 Kan. 389, 416 P. 2d 766; *Robertson v. State*, 206 Kan. 320, 478 P. 2d 196.) In *Berryhill v. Page*, 349 F. 2d 984, the Circuit Court of Appeals, 10th Circuit, said:

". . . In order to effectuate a waiver of the right to counsel, the record must plainly show that the accused was offered the assistance of counsel but intelligently and understandingly rejected the offer. . . ." (p. 987.)

Where a legal right has not been made known to an accused, it can hardly be said that he has knowingly and understandingly waived the right. The federal Supreme Court, in *Johnson v. Zerbst*, 304 U. S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019, put the rule in these words:

". . . A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. . . ." (p. 464.)

(See, also, *Brookhart v. Janis*, 384 U. S. 1, 16 L. Ed. 2d 314, 86 S. Ct. 1245.)

Thus, whether the defendant was advised of the right to appointed counsel at the lineup had a direct bearing on the voluntary character of his waiver. On this point the defendant himself was entitled to be heard and the trial court's refusal to permit him to testify taints its ruling with error.

Had the trial court held a full hearing on the issue of waiver, and had it then entered a finding, supported by evidence, that the waiver was intelligently, knowingly and voluntarily made, that would have ended the matter. Since the court, inexplicably, chose not to hear the defendant, we have this question: Should the case be remanded with directions to hear defendant's testimony as to the voluntary nature of his waiver? As we view this case, a remand for such purpose is not required.

The *Wade* opinion contains this language:

"*On the record now before us we cannot make the determination whether the in-court identifications had an independent origin.* This was not an issue at trial, although there is some evidence relevant to a determination. That inquiry is most properly made in the District Court. We therefore think the appropriate procedure to be followed is to vacate the conviction pending a hearing to determine whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error . . ." (p. 242.) (Emphasis supplied.)

Similar language is found in *Gilbert v. California*, supra, where the court said:

". . . However, as in *Wade*, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. . . ." (p. 272.)

There is recent federal authority, stemming largely from *Clemons v. United States*, 408 F. 2d 1230,—and intimated in *Wade* and *Gilbert*—that a reviewing court on appeal may itself make a determination as to independent source where the record is sufficient for that purpose. In *Hawkins v. United States*, 420 F. 2d 1306, the United States Circuit Court of Appeals, District of Columbia, held that it was "at liberty to decide" for itself, in view of an adequate record, whether the in-court identification stemmed from an independent source.

In a subsequent case the same appellate court said in *Cunningham v. United States*, 409 F. 2d 168:

"We have considered carefully the question of whether we may, as in Clemons, find in the record before us an independent source for the in-court identification, thereby dispensing with the need for a remand. . . ." (p. 169.)

The court thereupon proceeded to consider the circumstances surrounding the in-court identification of the accused by his victim and concluded there was no "very substantial likelihood of irreparable misidentification", a phrase which was used by the Supreme Court in *Simmons v. United States*, 390 U. S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967.

This court has spoken in similar vein in *State v. Sanders*, 202 Kan. 551, 451 P. 2d 148:

"Assuming the pre-trial identification of defendant was a critical stage of the proceedings at which counsel should have been present, the record before us clearly establishes the in-court identification of the accused had an independent source established by the cross-examination testimony of the witnesses appearing in the record of the trial. Therefore the determination required in *Wade* and *Gilbert* has been made and no further proceedings appear necessary to establish the independent source required of the in-court identifications. The absence of counsel at the pre-trial identification was harmless error. (K. S. A. 60-261.)" (p. 554.)

We have reviewed the entire record of trial, including the transcript, and consider that the evidence on the whole establishes an independent source of the in-court identifications of both Messrs. Stone and Rhoten. Each man was positive in his in-court identifica-

tion of Armstrong and neither of them referred on direct examination to a prior identification. It was only on cross-examination by defense counsel that the subject of pretrial lineups was brought into the case.

Both men had ample time and opportunity to observe Armstrong under well-lighted conditions as he participated in the respective robberies. In each of the holdups, two men first entered the store, one of them being short and brandishing a shotgun, (the No. 1 man) the other tall, and carrying a pistol (the No. 2 man). The second man was identified in each instance as Mr. Armstrong. Mr. Stone, who operated the Star Market as a neighborhood store, with a clientele drawn almost exclusively from the surrounding black community, had seen the same two men enter his store two days before the robbery and recognized them as being strangers. One of them bought an ice cream bar, the other a candy bar. The shorter man was carrying a case which looked like a case for a folding pool cue. The two men left when three or four customers walked into the store.

Both Stone and Rhoten showed a sense of discernment and discrimination in their identifications. Armstrong did not appear in the first lineup, but Mr. Stone recognized another individual appearing therein—and thought by the police to be a suspect—as having the same physical characteristics of the No. 2 man, Armstrong, because he stood tall and square shouldered with his head back. He declined to identify that suspect, however, but four days later at the second lineup he saw and identified Armstrong, whom he had previously described to the police as being tall and square shouldered with his neck held kind of stiff.

Mr. Rhoten showed similar restraint in identifying the defendant. He, too, had attended the first lineup and could not identify the No. 2 man. He had also provided the police with a detailed description fitting the defendant. Of the two robbers he had the most opportunity to observe the No. 2 man, or Armstrong.

During the robbery of Rhoten's store, four customers arrived at the market and were herded into the store and made to lie down by one of the two robbers. Three of these unfortunate customers identified the defendant as being that culprit, although none of them attended the lineup in which Armstrong had appeared.

The defendant was also placed at the scene of both robberies, and named as a participant therein, by a co-defendant, the No. 1

man, George Brown, who had been the first to enter both stores. Brown testified as a state's witness.

We are persuaded by the record that the in-court identifications did not have their source in the second lineup but that they stemmed from observation of the defendant at the scenes of the crimes.

Defendant's second claim of error pertains to certain testimony of Ramora McClain. A recitation of certain facts is essential to an understanding of this point.

Immediately after the holdup of the Star Market, which occurred in the morning, the four men who participated in the second robbery fled in a Cadillac car to the vicinity of a local garage operated by Willie Stevens. Here they disembarked and scattered. At that particular point in time, Ramora just happened to be sitting with Joyce Tuggle and her children in a car parked nearby. The occupants of the Cadillac were observed by Ramora, and one of their number, a Johnny Bell, got into the car with Joyce and herself— and Joyce's children—and they all left together for other parts.

Ramora appeared as a witness for the state and on direct examination she identified the four characters leaving the Cadillac as Brown, Jones, Bell and the defendant. However, on cross-examination she recanted her testimony, identifying Brown, Jones and Bell but stating she did not know who the fourth man was. After this reversal of form, the state asked the witness if she had been threatened with respect to her testifying in the trials, and she answered that she had received threatening calls from Johnny Bell's wife.

It is contended that this constituted prejudicial error. We do not agree. The state was entitled to go into matters affecting Ramora's credibility. K. S. A. 60-420 provides:

"Subject to sections 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issues of credibility."

The Advisory Committee Notes to the Code of Civil Procedure are set out in Gard, Kansas Code of Civil Procedure, Annotated, pp. 389, 390:

"This rule permits a party to impeach his own witness and is more liberal than the present Kansas practice. It follows the modern concept of justice by making the witness the agent of the court by which it is to arrive at the truth. It enables a party to defend himself against surprise or a double-crossing witness."

In his Commentary on this section, Judge Gard has said:

".  .  . The right to impeach one's own witness, in the interest of the ends of justice and adequate inquiry into the facts, is now stated as the rule rather than the exception, subject to the discretionary control of the trial court as provided in section 60-445. Here, as in a number of other instances in this article, the doubts are resolved in favor of rather than against admissibility of information which would go to the real weight of the witness' testimony. The witness is truly made the witness of the court rather than a mouthpiece to be charged to the account of the party producing him." (p. 390.)

A similar summation by Judge Gard of the meaning and effect of K. S. A. 60-420 may be found in 12 Kansas Law Review, at pages 1243 and 1244.

We find no abuse of discretion on the trial court's part in permitting the state to impeach Ramora. It would appear obvious that the prosecution was taken by surprise when she retracted her testimony on which the state doubtless had relied. The elicitation of evidence concerning threats received by the witness clearly related to her credibility and helped to explain her change of heart.

The next claim of error relates to the examination of Fred William (Willie) Stevens, a witness produced by the state. It was near his garage that the quartet decamped from the Cadillac. Stevens identified Brown and Jones by name, and Bell by sight. He did not, however, identify Armstrong, but said he did not know the fourth man and would not know him if he saw him again.

Counsel for the state thereafter asked Mr. Stevens if he had been convicted of felonies. This inquiry brought forth the candid admission that Stevens had five, or possibly six, prior felony convictions. This testimony was admitted over the defendant's objection. On cross-examination, Mr. Stevens denied any previous conviction of perjury.

We believe the court erred in overruling the defendant's objection to the broad question put by the state and in refusing to strike Mr. Stevens' answer. K. S. A. 60-421 reads in pertinent part:

"Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his credibility.  .  ."

This section limits the extent to which a witness may be examined with respect to prior convictions. (*State v. Jackson,* 201 Kan. 795, 443 P. 2d 279; *Tucker v. Lower,* 200 Kan. 1, 434 P. 2d 320.) Only those convictions for crimes which involve dishonesty or false statement may be shown as affecting credibility.

The question asked of Stevens was not limited to those crimes of inherent dishonesty which might stamp a witness as a potential perjurer. It was broader in scope than the statute permits and the objection should have been sustained.

However, we do not believe the error warrants reversal. The testimony of Mr. Stevens did not implicate Mr. Armstrong in any wrongdoing. Stevens testified he did not even know the man—a statement which the state did not attempt to refute—and he never identified Armstrong as one of the group which descended on the neighborhood where his garage was located.

We have already indicated that a co-defendant, George Brown, testified against Armstrong. Brown was the first man into the two stores—the man with the sawed-off shotgun. The substance of his direct testimony was that Armstrong was present at both robberies and entered the two grocery stores with him. Cross-examination brought out the fact that Brown had made a "deal" with the state in which a less severe sentence would be recommended in return for his testimony. At one place in his cross-examination Brown acknowledged he would commit perjury if thereby he could win complete acquittal.

The defendant contends that Brown showed himself so unworthy of belief that his testimony should have been stricken. Conceding that he may not appear as the most reliable and trustworthy of witnesses, this fact alone does not render his evidence inadmissible. Whether his testimony was worthy of belief was a matter for the jury to determine, not the trial court. (See 5 Hatcher's Kansas Digest [Rev. Ed.] Trial, § 115.) Nor may we, on appeal, make such a determination. (*State v. Scott*, 199 Kan. 203, 428 P. 2d 458.)

Finally, complaint is lodged against the trial court's action in striking certain testimony given by the defendant himself. It came about in this way: On cross-examination, detective Shackelford stated he did not remember having seen Armstrong prior to this case and denied that on one occasion he had given him a card which Armstrong tore up and threw at the detective's feet.

At a later time the defendant took the stand, testifying on direct only as to an alibi with respect to the Shopeze robbery and two alleged encounters with detective Shackelford. Concerning the latter, he testified that about a month after his arrival, the Wichita officer questioned him as to his education and whether he had been in previous trouble; that a month or so before he was arrested, Mr.

Shackelford asked him about providing information, saying he would help Armstrong if Armstrong would help him; that Shackelford gave him a card which he, Armstrong, threw at the detective's feet and that Shackelford then said he would get the defendant for something; he didn't know what, but that he would "put a rap" on him.

At the close of the defendant's cross-examination the trial judge gratuitously, and of his own accord, struck the foregoing testimony as immaterial, and instructed the jury to disregard it. We believe this was error. Mr. Shackelford testified on behalf of the state, and the stricken testimony was relevant on the issue of his credibility.

Although the court erred in striking this evidence, without motion by the state, we think the error did not rise to the height of prejudice. Even when added to the error respecting Stevens' testimony, we are not prepared to say that prejudicial error has been established.

It must be admitted that the trial of this case was not free from blemish. But perfect trials, if such there be, are rare indeed. Nor is perfection the measuring rod by which a trial is to be gauged. The purpose of the law is to insure a fair trial—a trial which is free of prejudicial error. (*State v. Wright*, 203 Kan. 54, 453 P. 2d 1.) Our cases hold that it is only where trial error adversely affects some substantial right of a litigant that it may be said to constitute prejudicial error. (*State v. Earsery*, 199 Kan. 208, 428 P. 2d 794; *State v. Cruitt*, 200 Kan. 372, 436 P. 2d 870.)

The provisions of K. S. A. 60-261 enjoin the courts to disregard those errors which do not affect the substantial rights of the parties. We believe the errors committed in this case fall within that category.

The judgment is affirmed.