George D. **HOWARD**

v.

J. Wayne **ALLGOOD**, Warden.

Misc. No. 882.

United States District Court
E. D. Louisiana,
Baton Rouge Division.
Aug. 15, 1967.

Ben R. Miller, Jr., Sanders, Miller, Downing & Kean, Baton Rouge, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen., for State of Louisiana, Teddy W. Airhart, Jr., Asst. Atty. Gen., for State of Louisiana, Baton Rouge, La., for respondent.

WEST, District Judge:

Petitioner, George D. Howard, after having exhausted all available State Court remedies, applies to this Court for the issuance of a writ of habeas corpus. He is presently serving a thirty year sentence at Louisiana State Penitentiary after having been convicted by a jury on November 29, 1961 of the crime of armed robbery. He attacks his conviction and sentence on five grounds, i. e., (1) that he was arrested without a warrant and without probable cause; (2) that he was the victim of an illegal search and seizure; (3) that he was required to violate his constitutional right to remain silent and was forced to incriminate himself by being forced to re-enact the alleged crime and to speak certain words; (4) that the Trial Court suppressed certain evidence vital to his defense when it refused to make the defendant name an alleged informer; and (5) that he was denied a complete transcript of the State Court proceedings had against him.

An attorney, Ben R. Miller, Jr., Esq., was appointed by this Court to represent petitioner, and an evidentiary hearing was held. Since the hearing Mr. Miller has diligently and exhaustively researched the law and has furnished this Court with six briefs on behalf of petitioner. However, after a careful review of the facts of this case, and the law applicable thereto, it is the opinion of this Court that petitioner's application for habeas corpus must be denied.

On September 15, 1961, at about 10:00 o'clock p. m., a service station owned and operated by Mr. Thomas A. James was robbed when an unmasked man with a gun took Mr. James' money while he was clearing his cash register preparatory to closing for the night. After picking up the money, the robber left through the back door of the station, got into what Mr. James believed to be an old Ford automobile, and "took off." An employee of Mr. James, Wardell Camper, was hosing down the front of the station at the time of the robbery. Mr. James immediately reported the robbery to the police and both he and Camper described, as best they could, the person who had committed the robbery. The following day Mr. James and Mr. Camper went to the police station to look at some "mug shots" in an attempt to identify the robber but after seeing them, while being able to tentatively identify the robber, they were unable to make a positive identification. A few days later, on September 20, 1961, Mr. James' station was again robbed by a man with a gun. This time there were three other witnesses, but the robber wore a mask. Mr. James was, however,

certain that it was the same man who had robbed him on September 15, 1961. One of the witnesses, Henry Burkett, who had driven into the station and saw the holdup, told the police that he knew the last name of the robber to be "Howard." Wardell Camper also informed the police that he knew Howard's brother. After the second holdup James and Camper were again shown ten or eleven photographs and this time they positively identified petitioner as the man who had twice held up the service station. After checking records in the Bureau of Identification, the police officers went to the home of petitioner on September 24, 1961. Not wanting to show their hand if petitioner was not at home, they had a friend of petitioner's named Edward Davis go to the door first and merely inquire as to whether or not petitioner was at home. At that time Davis knew nothing about the robberies and indeed did not know that petitioner was wanted by the police as a suspect in a criminal investigation. He, Davis, went to the door of petitioner's home and when petitioner's father came to the door, Davis told him that he had a date for petitioner for that evening if he, petitioner, was interested. The father delivered the message and petitioner, who had been sleeping, said that he had to work the next day and that he could not go out that evening. Davis then left the house. That was his entire participation in the police investigation. Thereafter the police entered the house and informed petitioner that both he and his brother were suspects in the two robberies. Petitioner denies this and contends, on the contrary, that he and his brother were informed that they were wanted for a traffic violation. The Court simply cannot believe this version of the story in light of the other unrefutable evidence pertaining to the activities of the officers in searching the house for a gun, and for the clothes that they suspected petitioner was wearing during the robberies. There is no dispute about the fact that petitioner and his brother then voluntarily, without threat or coer-cion, did accompany the officers to Mr. James' service station. But prior to leaving the house the officers seized and took with them a dark brown shirt and an old cap, which they found in the house, and an oily rag which they found in petitioner's automobile and which they suspected petitioner might have used as a mask during the holdup. They had no warrant to search either the house or the automobile.

When they arrived at the service station. in the police car Mr. James came out of the station and before petitioner got out of the car positively identified him as the man who had twice robbed his station. At that time neither the shirt nor the cap were being worn by petitioner, nor were these items, or the oily rag, shown to Mr. James prior to this positive identification. Immediately after this positive identification, petitioner was placed under arrest and later formally charged with armed robbery. After this identification was made, petitioner was made to re-enact the crime in the service station wearing the dark shirt and the cap previously referred to. But the positive identification of petitioner as the person who had committed the robberies was made by James before the re-enactment took place and while petitioner was still inside the police car. This identification merely confirmed the prior positive identification made by both James and Camper from the "mug shots" after the second robbery. It was James' emphatic testimony that neither the re-enactment of the crime nor the use of the shirt, cap, or oily rag had anything to do with his positive identification of petitioner as the man who had twice robbed his service station.

At petitioner's trial Mr. James again identified petitioner in the courtroom as the robber, and no mention was made at any time during the trial of the re-enactment of the crime or of the lineups in which petitioner had participated at the police station. Neither the shirt, cap, nor oily rag were in any way used during the trial, and since petitioner never confessed, no confession or incul-

patory statements of any kind were used. Petitioner was convicted entirely on the positive identifications made from the "mug shots," and while petitioner was in the police car, and while he was in the courtroom, with no mention being made at any time during his trial of the fact that he had re-enacted the crime or that he had appeared in any police lineups.

■■ Petitioner now contends that he was arrested without legal warrant and without probable cause, and that for this reason he is entitled to a writ of habeas corpus. While the Court is of the opinion that the evidence clearly and abundantly shows that the police officers had probable cause to make the arrest, nevertheless, even if this were not so, an unlawful arrest in itself is not grounds for setting aside an otherwise valid conviction, especially where there is no evidence to show that anything occurred as a result thereof to deny the petitioner a fair trial. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541; Evans v. United States, 325 F.2d 596 (1963); Delano v. Crouse, 327 F.2d 693 (10 Cir., 1964), cert. den. 377 U.S. 1004, 84 S.Ct. 1941, 12 L.Ed.2d 1053; United States ex rel. Gary v. Hendrick, 238 F.Supp. 757 (E.D.Pa.1965); Madison v. Tahash, 249 F.Supp. 600 (D.Minn.1966), 359 F.2d 60 (CA 8 1966); Howard v. State of Florida, 259 F.Supp. 499 (S.D.Fla.1966). There is no evidence in this case to even indicate that the manner in which petitioner was arrested in any way deprived him of a fair trial upon his not guilty plea.

■ Secondly petitioner contends that his premises were illegally searched and that certain clothing was illegally taken therefrom. Conceding, arguendo, that this is so, it is clear from the record, and indeed from petitioner's own testimony before this Court that nothing seized during the search of his premises was used against him during his trial. There was no mention made during his trial either before the jury or otherwise of the things allegedly seized in petitioner's home. And furthermore, since this Court has concluded that the evidence clearly shows that petitioner was positively identified by the victim and placed under arrest completely independently of the articles allegedly seized, the search and seizure, even if illegally conducted, in no way prejudiced petitioner or denied him in any way his right to a fair trial. He was arrested, charged, tried and convicted not on the basis of any evidence seized from his home but rather on the positive identification of witnesses without any reference whatsoever to the fruits of the search.

■ Petitioner next argues that his constitutional rights were violated when he was forced to re-enact the crime, and to speak certain words which he alleges constituted self-incrimination. But it must be remembered that the evidence shows that petitioner was positively identified by Mr. James both from photographs and from personal confrontation *before* petitioner was made to re-enact the crime and without any reference thereto. In other words, the identification of petitioner made by the witnesses, Mr. James, and the identification upon which petitioner was convicted was in no way "tainted" by any unconstitutional lineup procedure, and thus, even under the teachings of the recent cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (June 12, 1967), and Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (June 12, 1967), which, incidentally, according to Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (June 12, 1967), do not apply retroactively, the fact that petitioner was required to re-enact the crime, speak certain words, or appear in a police lineup, even without the benefit of counsel, did not violate his constitutional right against self-incrimination.

■ Petitioner next complains that the prosecution suppressed evidence vital to his defense when it refused to divulge the name of an "informer." There is no merit to this contention. The so-called informer referred to is Edward Davis, now deceased. This is the man who, at

the request of the investigating officers, went to the door of petitioner's home merely to ascertain whether or not the petitioner was at home. He knew nothing of the crimes that had been committed and had no knowledge of the reasons for the investigation. His sole role in the affair was to let the police officers know whether or not petitioner was at home before they attempted to confront him. At the trial petitioner, through his attorney, demanded to know the name of this so-called informer. Officer Chester Gros, one of the investigating officers, refused to divulge the name of Edward Davis because he claimed that he did not want to endanger this witness. The officer was held in contempt of court for refusing to divulge the name and actually served twelve hours in jail for refusing to answer the question. But as a matter of fact, Edward Davis was not an informer insofar as the crime or any element thereof was concerned, and petitioner was in no way prejudiced in his defense by not knowing the name of the person who advised the police that he, petitioner, was at home at the time of his arrest.

Petitioner's last complaint is that he was denied a complete transcript of the State Court proceedings because of his poverty. This is simply not true. During his trial several· bills of exception were reserved. As to each of these bills all of the testimony requested by petitioner's counsel was preserved and sent to the Louisiana Supreme Court with his appeal. There is no evidence to support his claim that he was denied any portion of the transcript of the State ·Court proceedings to which he was entitled. See Mack v. Walker, 372 F.2d 170 (CA 5 1966).

After reviewing the State Court record in this case, and after having held a full evidentiary hearing before this Court, the conclusion is inescapable that petitioner did in fact and in law have the benefit of a fair trial upon his plea of not guilty and that there is no evidence whatsoever to support his claim that he has been denied his constitu-

tional rights under the Fifth, Sixth, or Fourteenth Amendments to the United States Constitution. For these reasons petitioner's application for a writ of habeas corpus will be denied.