**People of the State of Illinois, Plaintiff-Appellee, v. William A. Lynch, Defendant-Appellant.**

**Gen. No. 52,672.**

First District, Second Division.

June 10, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty, Assistant Public Defender, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

The defendant, William A. Lynch, was indicted for armed robbery. In a jury trial, he was convicted of robbery. After his oral post-trial motions were denied, judgment was entered. Following a hearing in aggravation and mitigation, the defendant was sentenced to nine to fifteen years in the State Penitentiary. He appeals.

This case involves a robbery which occurred in an IGA store located at 6407 West 79th Street in Oak Lawn, Illinois. It is undisputed that the crime occurred at approximately 7:45 p. m. on October 28, 1966, when there were no customers present. About $250 was taken from the cash register. The money taken by the sole robber included currency and change. All the change was wrapped in regular quarter, dime, nickel and penny bank rolls, which had the name "Cherut, by Harris Trust & Savings Bank" stamped on them. Five rolls of change were taken. This was the testimony of Mrs. Joan Kolodziejek, an eyewitness to the crime and the cashier at the IGA store.

The State had marked as People's Exhibit 1 for identification, an empty coin wrapper or roll. Mrs. Kolodziejek identified it as a wrapper for quarters. The witness went on to say that this quarter wrapper had the name "Cherut, by Harris Trust & Savings Bank" stamped on it;

it was in her cash register on October 28, 1966; and it was taken by the man who committed the robbery on that date.

Mrs. Kolodziejek also observed and remembered some of the robber's physical characteristics and his clothing. The eyewitness stated that there was dried blood about his nostrils and a cut behind his right ear with dried blood there also. In addition, the robber wore a plaid shirt, dark black or blue pants, and a dark black or blue jacket. She then identified the defendant in the courtroom as the man who had robbed the store on October 28, 1966. On that date, the store manager, Henry Easter, was also present. Both Mrs. Kolodziejek and Easter were told by the robber to walk to the rear of the store or be shot. In time, they saw that they were alone. Easter immediately called the Sheriff's Police. About fifteen minutes later, Mrs. Kolodziejek saw the defendant again. The Sheriff's Police had arrested him and brought him in front of the IGA store in a police car.

On cross-examination, Mrs. Kolodziejek testified that she never saw a gun during the commission of the offense. She also was never shown a photograph of the defendant at any time. This witness had never seen the defendant before and did not know that he lived in the neighborhood. She did tell the police that the robber was between 5' 7" and 5' 10" in height, and did give them a physical description shortly after the crime had occurred. Approximately fifteen minutes later, the police returned to the store and told Mrs. Kolodziejek that they had a suspect in the police car. Mr. Easter left the store first, viewed the suspect, and returned but did not speak to Mrs. Kolodziejek. She then went to the police car, looked in, and saw two men sitting in the rear seat: Officer Greene, who is a Negro and a member of the Sheriff's Police, and the defendant, a Caucasian, whom she then and there identified as the man who had robbed the

54

store. She went to the police station later that evening and again identified the defendant as the robber.

Continuing, Mrs. Kolodziejek stated that immediately prior to the robbery, she had run out of change. Mr. Easter then gave her one roll of quarters; one roll of nickels; a roll of dimes; and two rolls of pennies. She did not have an opportunity to open these wrappers before the robbery occurred. All the coin wrappers had stamped on them: "Cherut, by Harris Trust & Savings Bank." The cashier explained that Cherut is a very good customer of the store and is a coin collector who picks up the store's loose coins in exchange for wrapped or rolled coins which he apparently obtains from the bank. Mrs. Kolodziejek did not know if Cherut exchanged rolled coins with anyone other than the IGA store. Earlier on the evening of the robbery, this witness saw Cherut hand Easter, the store manager, rolls of coins. She received some of these rolls from Easter shortly before the crime occurred.

On redirect examination, Mrs. Kolodziejek stated that the store was fully illuminated at the time the crime occurred. During the robbery, the defendant did not wear a mask and was, at times, within six to twelve inches of this witness. She saw his face and was able to face him directly.

Henry Easter, the store manager, also testified for the State as an eyewitness and corroborated much of Mrs. Kolodziejek's testimony. He also noticed that the robber had bloodstained nostrils, a laceration behind his right ear and was wearing a plaid shirt, dark blue pants, and a dark jacket. He too pointed out the defendant in the courtroom as the robber and identified People's Exhibit 1 as the coin wrapper or roll which he had obtained from Cherut. The wrapper had Cherut's name on it. Easter often received rolled change from Cherut in exchange for the store's loose coins. The wrappers or rolls always had Cherut's name on them.

On cross-examination, Easter stated that after the robbery, he gave a description of the robber to the police in which he said the culprit was 5′ 6″, weighed approximately 140 pounds, and had light hair. Approximately fifteen minutes later, the Sheriff's Police returned with a suspect. Easter identified the defendant, sitting in the rear seat of the police car, as the robber. There were two Caucasians sitting in the back seat when he looked into the car and made his identification. The defendant still had blood under his nostrils. In conclusion, Easter stated that he was positive that People's Exhibit 1 was the quarter wrapper which was taken from his store by the robber on October 28, 1966. Although Easter admitted that neither he nor Mrs. Kolodziejek placed any identifying marks of their own on the wrappers, he did say that the IGA store received its rolled or wrapped coins from no other source than Mr. Cherut, who came into the store approximately three times a week for that purpose. Easter did not know if Cherut was a coin collector or brought coins to any other stores in the area.

Officer Marvin Boykin, a member of the Cook County Sheriff's Police, stated that on October 28, 1966, he was sent to the IGA store to investigate an armed robbery. He interviewed Mrs. Kolodziejek and Mr. Easter, received a description of the robber, and put out a radio broadcast. In concluding his testimony on direct examination, Boykin examined People's Exhibit 1, the coin wrapper or roll, and stated he had recovered it from the Defendant's pocket in the police station. He and Officer Greene had initialled it at that time.

On cross-examination, Officer Boykin stated that the two eyewitnesses in the store gave him a physical description of the robber and described his clothing. Boykin remained with them until the police appeared with the defendant. He then took Mrs. Kolodziejek and Mr. Easter out to view the accused and asked them if they could identify the suspect as being the robber. The de-

fendant, a Caucasian, was sitting in the back seat of the police car with Officer Greene, a Negro. The accused was then taken to the police station where he was finger-printed and photographed. Officer Boykin noticed there that the defendant had blood under his nose and around his right ear.

Officer Earl Greene, a patrolman with the Cook County Sheriff's Police, testified that on October 28, 1966, while on duty in a police vehicle, he heard a description of an alleged armed robber. Shortly thereafter, he arrested a man fitting this description. The arrest was made about a block and a half from the IGA store. Officer Greene then pointed out the defendant in the courtroom as the man he arrested. At the time of the arrest, according to Greene, the defendant was wearing a dark blue jacket, a checkered shirt, and had a small scar behind his right ear in addition to dried blood on his right cheek. Later, at the police station, the defendant emptied his pockets. Greene identified People's Exhibit 1, a coin roll or wrapper, and People's Exhibit 2, United States currency and loose coins, as having been found on the defendant's person in the police station.

On cross-examination, Officer Greene said that People's Exhibit 2 contained $114 in currency and $21.10 in loose coins. The currency included four (4) $10 bills; nine (9) $5 bills; and twenty-nine (29) $1 bills. The coins taken from the accused included $11.75 in quarters; $6.30 in dimes; $2.30 in nickels; and 75 cents in pennies. The quarters were not rolled but were loose. Officer Greene stated that he had known the defendant for approximately five or six years and knew that the accused lived in the neighborhood of the robbed store. The defendant was arrested less than a block from where his parents lived. He did not attempt to flee and was not searched until later in the evening at the police station. No gun was found. He was arrested approximately ten minutes after Greene had received a police call de-

scribing the alleged armed robber. At the time of his arrest, the accused was wearing a plaid shirt, dark and light checks, according to Officer Greene. The defendant was then taken to the scene of the robbery. When they reached the IGA store, only two people were sitting in the rear seat of the police vehicle, Officer Greene and the defendant. Greene went on to say that the accused was fingerprinted and photographed at the police station. He did not have the photograph with him however.

A Ban-Lon shirt was then marked as Defense Exhibit 2 for identification. Defense counsel asked Officer Greene if the defendant was wearing this shirt when he was arrested. Greene stated that he did not recall this shirt. Defense counsel then moved, out of the presence of the jury, that the State produce the photograph taken of the defendant in the police station so that the defense could examine it and determine if the defendant was wearing a plaid shirt or Ban-Lon shirt and if the defendant was bloodied around the nose and right ear. The prosecution argued that it did not have the photograph available and that the defendant could subpoena it and introduce it into evidence as part of his case-in-chief. After the court denied the motion, defense counsel stated that he would immediately send out a subpoena.

After People's Exhibits 1, the coin wrapper, and 2, the currency and coins, were admitted into evidence, the State rested its case. Thereafter, three witnesses testified for the defense: Lee R. Nelson and the defendant testified in person, whereas the testimony of Jack Souer was stipulated into the record. The defense was alibi and denial. Souer's stipulated testimony was that he was with the defendant from approximately 6 p. m. to 7 p. m. on the day of the robbery. At that time, he did not notice any cuts, bruises, or blood on the defendant's nose and face.

Lee R. Nelson testified that on the day of the robbery, he and the defendant were together in a lounge, Mr. Kay's located at 83rd and Cicero. Nelson arrived late in the afternoon. The defendant was already present. Jack Souer was also in the lounge. While he was there, Nelson noticed that the defendant had an altercation with another man outside the lounge. The defendant re-entered the lounge, but Nelson did not recall if there were any cuts or bruises on the accused's face. He also did not remember if there was any blood on the defendant's face. Nelson left the lounge between 8:30 and 9:00 p. m. The defendant left with him and asked for a ride to 79th Street.

On cross-examination, Nelson stated that he did not know where he had been on October 26 or October 27, 1966, the two days preceding the date of the instant crime. He knew he had met the defendant on October 28, 1966, however, because it was the first time he had seen the accused in over a year. Later, Nelson admitted that he really did not know on what date he had met the defendant. He expressed this doubt to defense counsel, who then told him that he, in fact, met the defendant in the lounge on October 28, 1966. He did see Souer in the lounge but Nelson did not independently recall the exact date of his meeting with Souer and the defendant. He believed the defendant was playing pool in the lounge with the man he was to fight later in the day. Nelson did not know if the two men were playing for drinks or for money.

The defendant testified and denied any participation in the robbery. He admitted having a fight outside Mr. Kay's lounge on October 28, 1966, with a person with whom he had been playing pool for money, but denied having any cuts or bruises on his face or behind his ear on that date. Souer and Nelson were with him on October 28, 1966. The defendant had arrived at the lounge by

himself at 10:30 a. m. and left with Nelson between 8:30 and 8:45 p. m. He was dropped off at Mike's Lounge near the home of his parents. He did not stay but was on his way home when he was arrested by Officer Greene, whom the accused had known for about ten years. The defendant testified that he was wearing a Ban-Lon shirt, Defendant's Exhibit 2 for identification, when he was arrested. Regarding People's Exhibits 1 and 2, the accused stated that he received the quarter roll or wrapper from his pool-playing opponent whereas of the currency and coins in evidence, $55 was his property and $85 he had won playing pool that day. In conclusion, the defendant stated that the IGA store was two blocks from the home of his parents; that he had been in the store on many occasions; and that he was 5' 5" and weighed 165 pounds.

On cross-examination, the accused stated that he began playing pool in the lounge with an unknown stranger at 2:30 p. m. The defendant had arrived at Mr. Kay's Lounge at 10:30 a. m. and had drunk some beers and tomato juice in the four hours before he began playing pool. For approximately an hour, the defendant and the unnamed stranger played pool for drinks. Then, at approximately 3:30 p. m., they began to play for $10 a game after the defendant had consumed six bottles of beer. By 4:30 p. m., the accused had consumed thirteen bottles of beer. He did not eat anything that day. The pool games continued until 6:30 p. m. when an altercation began between the defendant and his opponent when the latter refused to pay the accused any money. The altercation ended after the defendant was knocked down by one punch to the jaw. This was allegedly the only punch thrown in the fight. It was the defendant's testimony that he did not get cut in his right ear nor were his nostrils bloodied. After the fight, the stranger allegedly apologized to the defendant, took the accused to the former's car and satisfied his pool-playing debt by paying the defendant in currency and rolled or wrapped

coins. The defendant testified that although he drank sixteen beers and ate nothing on October 28, 1966, he was able to win about $80 in the pool games at approximately $10 a game.

After examining People's Exhibit 1, the coin wrapper, the accused stated that it was similar to the wrapper which the stranger had given him on October 28, 1966, and which the defendant had in his pocket when arrested. All the coins allegedly given to the defendant on that day by his opponent were in wrappers or rolls, but the accused did not know what happened to the rest of the wrappers. In conclusion, the defendant stated that his friend, Nelson, drove him from the lounge to another tavern near the accused's house. He was dropped off between 8:30 and 8:45 p. m. and testified that he was arrested at approximately 8:45 p. m.

It was stipulated by counsel that when the defendant was examined by the medical department of the Cook County Jail on October 29, 1966, the day following the robbery, there were no cuts or abrasions on him.

In rebuttal, the State offered Samuel Rosen, Chief Clerk of the Circuit Court, Criminal Division, who was charged with the care and custody of its records. He had the accused's records in his possession and stated that the defendant had a prior conviction for armed robbery based upon his plea of guilty.

On appeal, the defendant urges that he was not proved guilty beyond a reasonable doubt. In addition, he contends that he was denied a fair trial in that: (1) the identification procedure employed by the police prior to trial was unfairly suggestive; (2) denial of defense counsel's right to examine a photograph of the defendant taken shortly after his arrest, which denial occurred during cross-examination of the arresting officer, was violative of due process; (3) the submission of two verdicts, each finding the defendant guilty of robbery, confused

the jury and placed undue emphasis upon a guilty finding.

In his initial contention, the defendant urges that his conviction be reversed since the State failed to prove him guilty beyond a reasonable doubt in that their evidence was improbable, unconvincing and unsatisfactory. We do not agree. In People v. Tribbett, 41 Ill2d 267, 271, 242 NE 2d 249, 251 (1968), in affirming a robbery conviction, the court stated:

"... It has been the firm holding of this court that the testimony of a single witness, if it is positive and the witness is credible, is sufficient for a conviction even though the accused has contradicted the testimony ...."

In the case at bar, two eyewitnesses were able to observe the unmasked robber for a number of minutes in a fully illuminated grocery store. One eyewitness stated that at times the robber was directly facing her and was only six to twelve inches away. There was no evidence that he was wearing a hat or glasses of any sort. Both eyewitnesses told the police that the robber had dried blood under his nostrils and around his right ear. They also described his clothing. This information was instrumental in leading to the prompt arrest of the accused within fifteen minutes after the crime had occurred and less than two blocks from the robbery scene. The arresting officer testified that, when arrested, the accused was wearing the clothing described by the eyewitnesses. Both the arresting and investigating officers also stated that the defendant had dried blood under his nostrils and around his right ear thereby corroborating the eyewitnesses on this point as well. In addition, the two eyewitnesses identified the defendant as the robber both at the scene of the crime shortly after it had occurred, and at the trial. Their testimony did not waver when submitted to vigorous cross-examination.

■ The credibility of the witnesses and the weight to be accorded their testimony are matters for the jury. By the return of its guilty verdict, it is apparent that the jury in this case believed the witnesses for the prosecution and attached little weight, if any, to the defendant's attempted alibi defense which was weakened by the inability of one defense witness to remember the exact date on which he saw the defendant in the lounge and was further weakened by the accused's own testimony that he left the lounge at 8:30 p. m. on October 28, 1966, whereas the arresting officer stated that he arrested the defendant in Oak Lawn, Illinois, at approximately 8:00 p. m.

The jury also had before it the fact that an empty quarter wrapper or roll was found on the defendant. The two eyewitnesses, due to the notation that appeared on the roll, identified it as being taken by the robber from the cash register of the IGA store. Furthermore, $21.10 in loose coins and $114 in currency were found on the person of the accused. Approximately $250, in currency and coins, was taken from the store. The jury weighed these incriminating factors along with the explanation of the defendant that he had won $85 and acquired the quarter wrapper in pool games played for $10 a game with an unnamed stranger during an afternoon in which the accused drank sixteen beers and ate nothing.

■ We have carefully reviewed the evidence in this case and find that the defendant was proved guilty beyond a reasonable doubt. People v. Tomaszewski, 406 Ill 346, 352–53, 94 NE2d 154, 158–59 (1950). We are not of the opinion that the conviction should be reversed because approximately $115 of the stolen money was never recovered or because the day after the crime, the defendant did not have abrasions on his face when examined at the County Jail.

■ The defendant also contends that the identification procedure employed by the police at the scene of the

crime approximately fifteen minutes after it had occurred was so unfairly suggestive that it deprived him of a fair trial. In support of this proposition, the defendant cites Stovall v. Denno, 388 US 293, 302, 87 S Ct 1967, 1972 (1967), wherein the court stated that the confrontation between accused and identification eyewitnesses could be so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a denial of due process but such a claimed violation would depend on the totality of the circumstances surrounding the confrontation. Such a violation of constitutional rights would affect the admissibility or competency of identification evidence arising from lineups and not merely the weight of the identification evidence. Stovall v. Denno, 388 US 293, 300, 87 S Ct 1967, 1971 (1967); Simmons v. United States, 390 US 377, 382, 88 S Ct 967, 970 (1968). The defendant in this case filed and argued a pretrial motion seeking to suppress the testimony of the two identifying eyewitnesses pertaining to their identification of the accused shortly after the robbery on the ground that the method of identification in the police car confrontation violated due process. The motion was denied, and the two eyewitnesses were permitted to testify. In this appeal, the defendant renews this contention.

It should be noted that the Illinois Supreme Court in People v. Nelson, 40 Ill2d 146, 238 NE2d 378 (1968), adopted the Stovall rationale in affirming a narcotics conviction holding that the defendant was identified independently of and uninfluenced by any viewing of him at an attempted lineup. In the instant case, the accused specifically contends that the identification procedure was unnecessarily suggestive because: (1) it was a one-man showup; (2) the Caucasian suspect was sitting next to a Negro policeman in the rear seat of a police vehicle thereby allegedly suggesting to the identifying witnesses that the suspect was the man whom the police wanted them to identify; and (3) immediately prior to the con-

64

frontation, the police had told Mrs. Kolodziejek that they had a suspect in the police car.

■ We do not agree with these specific contentions but rather hold that, within the facts of this case, the one-man immediate showup was not violative of a fair trial. It must be remembered that the defendant was arrested less than two blocks from the robbery scene, approximately fifteen minutes after the crime had occurred, and was then returned to the IGA store where he was identified by the two eyewitnesses as a culmination of these still continuing series of events. Within the facts of this case, we see nothing unfair in the use of an immediate one-man showup or in the fact that the defendant, a Caucasian, was viewed sitting in a police car next to a Negro police officer. The police were confronted with a fast-moving situation in which they apparently sought to gain either immediate identification of the defendant as the robber at a time when the memories of the two eyewitnesses were still fresh, or, as an apparent alternative, if the accused was not so identified, they would have freed him and immediately started to look for another suspect in the neighborhood who fitted the physical description given them by the eyewitnesses.

There is testimony in the record that the two eyewitnesses viewed and identified the accused separately and not in each other's presence. Furthermore, the police only told them that they had a "suspect" for them to view and did not say that they had arrested the man who robbed the store. Having viewed the identification evidence in the totality of the circumstances as reflected in the record, this court holds that, within the facts of this case, the one-man immediate showup was not so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the defendant a fair trial.

No cases have been cited to us nor have we found any Illinois cases which are factually similar to the instant

case on this point. However, for two recent cases from other jurisdictions coming to the same conclusion as we have on somewhat similar factual grounds, see Commonwealth v. Bumpus (Sup Jud Ct Mass), 238 NE2d 343, 346–47 (1968), and State v. Singleton, 253 La 18, 215 So2d 838, 842–43 (1968). Since the showup confrontation was held on a date prior to June 12, 1967, the constitutional principles emanating from the failure of defense counsel to be present at lineups or showups enunciated for the first time in United States v. Wade, 388 US 218 (1967) and Gilbert v. State of California, 388 US 263 (1967) are not to be applied to this case. See Stovall v. Denno, supra.

Thirdly, the defendant contends that he was denied due process of law when his counsel, during cross-examination of the arresting officer, was denied the right to examine a photograph of the defendant taken shortly after his arrest. It is apparent from the record that defense counsel sought this picture in an attempt to impeach the testimony of the State's witnesses regarding the type of shirt the accused was wearing when arrested and whether he had blood around his nostrils and right ear. The two eyewitnesses testified that the robber was wearing a plaid shirt and was bloodied around the nostril and right ear. The arresting officer testified that the defendant was wearing a checkered shirt when arrested and did have dry blood on his face. The defendant contended that he was, in fact, wearing a Ban-Lon shirt and was not bloodied when arrested.

The photograph taken of the accused at the police station shortly after his arrest might have aided the defense. Defense counsel did not request this photograph until the trial was in progress. The prosecution stated that it did not have the photograph available and that the defendant could subpoena it and introduce it into evidence as part of his case-in-chief. After his motion to produce had been denied, defense counsel stated that he

66

would immediately send out such a subpoena. No subpoena is found in this record however. Apparently, defense counsel abandoned his efforts to subpoena this photograph for reasons best known to himself. The State cannot be faulted for failing to have such a photograph in its file. It must be remembered that the trial was held approximately nine months after the picture was taken. Furthermore, defense counsel never filed a pretrial motion to produce this photograph which would have informed the prosecution, through orderly legal channels, that the defendant wished to examine it. In light of these factors, we find no merit in this contention.

Finally, the defendant urges that the submission of two verdict forms to the jury, each finding him guilty of the same charge, confused the jury, placed undue emphasis on a guilty finding, and denied him a fair jury trial. The record reveals that the jury was instructed as to the statutory definitions of both armed robbery and robbery; that it was given three forms of verdict submitted by the prosecution, one finding the defendant guilty of armed robbery, one finding him guilty of robbery, and one finding him not guilty; that defense counsel stated that he had no objection to the verdict forms; and that the court viewed the return of the signed verdict as a conviction of the lesser offense of robbery, not armed robbery. We fail to see how the accused was prejudiced by these actions. The two guilty forms of verdict, when viewed in conjunction with the instructions to the jury, did not find the defendant guilty of the same charge as urged by him in this appeal. We find no merit in this contention.

The judgment is affirmed.

Judgment affirmed.

BURKE and McCORMICK, JJ., concur.