PIERCE, Chief Judge.
Appellant Willie James Russell appeals to this Court from an adverse judgment and sentence consequent upon a jury verdict finding him guilty after trial upon an information for rape in the Polk County Circuit Court.
The facts adduced in evidence at the trial were without material contradiction except as to the identity of the accused, which was the crucial factual point in issue. On July 16, 1970, at about 9 o’clock P. M. the prosecutrix was at a laundromat in Lakeland two or three blocks from her home. She then went home for some errands, then returned to the laundromat which was “air conditioned, and I sat in there until it got cold for me and then I come out and sat and waited for my laundry to finish and I sat over with my back to the door and waited till my laundry had finished drying and then I folded my laundry.” She then put her laundry “in the basket and took it out to the car and set it down beside the car.” It was then about 10:30 P.M. and her car “was the only car there ... I went out and looked to my left over standing under the window or near the window and I saw a black male standing there, and I went out to the car. I didn’t pay any attention to him. So I went out and set my laundry down by the car and opened the back door and put the laundry on the back seat . . . The black male said to me, he said, ‘Could I help you’? And I said, ‘No, thank you.’ I said, ‘I’ll do it alone’. And I opened the back of my station wagon back and put my laundry in the back seat. And he said to me, he said ‘I’ve been looking for a ride to Mulberry.’ And I said, ‘Well, I’m not going that way.’ ... I said, T only live a short distance from here or a short ways,’ and I went ahead and locked the back of my car, and all this time he was mentioning a ride to Mulberry ... so I got in my driver’s side of the car, locked my door, and he said something to me and I didn’t understand what he said so I rolled my window down just a few inches —two or three inches — couldn’t realize anybody could get their hand in my car door, and I must have turned my head to put my keys in the ignition and the first thing I knew this black male had his hand *438 in my car window and had my door open, and he pushed a knife at me and he said, ‘You push over or I’ll cut your throat, and-don’t say a word.’ So I reached my hand to the door to jump out of the car and he said, ‘Don’t do it or I’ll cut your throat.’ So he told me to come over there and sit by him. And by this time, he had the car backing the car out, was leaving with the car’ . . . ‘So I reached for the door handle and he said, ‘Don’t do it.’ And he started backing up the car out on Parker. So we went down, I think it was about two blocks, and turned. And all this time, I was trying to talk to him and watch what he was going to do with that knife at the same time, begging him to let me go. I thought he wanted the car. And I asked him just to let me out, and he said no, he wasn’t letting me out. And I thought he was going to go back to South Florida Avenue, but he didn’t. We went up Ariana and went up in back — he took — there’s a one-way street or a side road there in back of Dixieland School, and me begging him to let me out, and I told him I had four children, I’d do anything he said, just to let me go. And he said, ‘No.’ He kept asking me to come over and sit by him and try to make me sit by him and him driving with a knife in his hand. And we went up and parked, he drove around a one-way street and went up — and went around the back underneath the oak trees out there, and there’s a bicycle rack, and it was dark, but it was full moon that night, I remember. And he parked the car and turned the lights off. And I said, ‘Well, why don’t you just let me go and you take the car.’ And he got up over me with that knife and I thought he was going to start cutting on me with that knife he had. And he said, ‘You just lay back in the seat’. And I said, ‘No, what are you doing?’ And he said, ‘You just lay back and keep your mouth shut.’ And I said, ‘Put that knife away’. I said, ‘How do you expect me to do anything with you holding a knife on me like that.’ And he just pushed me over in the seat and he said, ‘I’m not going to hurt you,’ he told me that.” Then, with the naturally accompanying picturesque language, she described the ensuing forcible carnal relations, not necessary here to depict.
A young man in a Volkswagen car parked nearby rolled his window down, saw her clothes were torn, got out of his car, came over and took her into his home nearby, where she told him what had happened. The local police and a physician were summoned, to whom she gave her story, after which she was taken to the Lakeland General Hospital emergency room. She stated she was terrified during the whole episode “. . . I couldn’t believe it was happening to me, something like this, I didn’t know what to do next, I was so scared when he got up on me with that knife I thought he was going to kill me, and I was so scared I couldn’t even scream if I tried. I didn’t even have saliva in my mouth. I couldn’t scream.” The balance of her testimony had to do largely with the street lighting available between the laundromat and the Dixieland school, Ariana Street, the bicycle rack, the playground, etc.
She testified that on the following day, July 17th, she identified Russell at the Lakeland Police Department as her assailant, that there were “four in the lineup”, that he was third in the line with no similarity between him and the other three, although “all four of the people dressed the same way.”
One Dale Eugene Chandler, then enrolled at Polk Junior College, the occupant of the Volkswagen car which she mentioned, testified that he took her to the residence of a boy friend of his, that she had on a light-colored dress which was ripped apparently from “some sort of struggle, her clothes were soiled, and I asked her if there was something I could do and she told me she’d been raped, so immediately I took her across the street” to his friend’s residence. He stated “she seemed to be undergoing extreme emotional circumstances . . . I could see [her clothes] were very soiled, *439 very torn. Part of her brassiere was down over her shoulder and her dress was torn on that side.”
Dr. Robert C. Eissman testified he examined the prosecutrix in the hospital emergency room soon after the episode and that his physical examination was consistent with her version of what happened.
Lakeland Police Officer Frank Woolen testified that on the night in question, after he first got the report of the incident, he went around the vicinity making inquiries, in the course of which he spotted Russell who “started running and, of course, I put the police car right up to the back of him as he was going out of the entrance onto Hancock [Street] and he stopped . . . I got out of th’e car and asked him where he was going or what he was running for and he said that he had just been into a fight in Mulberry . . . with two colored males”.
Michael Ernest Purvis, also a Lakeland Police Officer, testified that on the night in question he went to the home of the prosecutrix and “she was very upset mentally. Her clothing was somewhat soiled on the back on the left side. It was ripped around the shoulder, partly on the right side and down around the waist or up above the waist, her hair was somewhat mussed”, that she presumed to relate what had happened, that she took him to the vicinity of the Dixieland School, and when they got there “I observed a Ford station wagon parked on the west side of the building in a north and south direction the driver’s side of the car was locked, the window was partially down approximately maybe two inches, the passenger side of the car was unlocked, the window also down maybe about two or three-inches . . . Beside the right front passenger door, there were several shredded white napkins laying on the ground, also numerous scuffle marks beside the car door.”
The foregoing was all the testimony, Russell himself did not take the witness stand, nor any other witness in his behalf.
The main points relied upon here for reversal are the sufficiency of the evidence as to identity of the accused being the assailant, and the propriety of the in-Court identification of Russell. As to the latter point the evidence that went to the jury is so meager that no serious contention could be made concerning it. When the prosecutrix identified Russell during the trial no objection was made by defense counsel that it was in anywise tainted by any previous improper line-up identification. Also, United States v. Wade, 388 U. S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, upon which Russell relies, have to do with impropriety at a pre-trial line-up after the filing or return of an information or indictment but not prior thereto, which would take the present situation out of the purview of the cited cases.
As to the question of identification, suffice to say that Russell was positively identified as the assailant, his actions on the night in question were specifically documented, his guilt of the charge was abundantly established, and finally, he did not even take the stand to deny it. Such voluntary decision could not, of course, be commented upon at the trial, but it can be now — and we do it.
No reversible error has been demonstrated here. The judgment of conviction appealed is therefore — •
Affirmed.
HOBSON, J., concurs.
McNULTY, J., concurs in conclusion.