OPINION OF THE COURT
Herman Cahn, J.
Should the identification testimony of a prospective witness be suppressed where, approximately 30 minutes after having her purse snatched, and after having been brought in a police car to a place approximately five blocks from the site of the incident, the victim is shown some of the proceeds of the robbery and asked whether she recognizes them, and then views two persons in the rear seat of another police car and is asked whether she recognizes either of them?
An indictment has been filed against the defendants accusing them of robbery in the third degree (Penal Law § 160.05), grand larceny in the third degree (Penal Law § 155.30 [5]), and criminal possession of stolen property in the first degree (Penal Law § 165.50).
Defendant Willie Howard (Howard), claiming that improper identification testimony may be offered against him, has moved *204 for an order excluding the identification testimony of Miriam Kaprow because of an improperly made previous identification of him by the prospective witness.
The People have the burden of going forward in the first instance to show that the pretrial procedure was permissible and proper. Defendant, however, carries the burden of demon-; strating that the evidence should be suppressed. If the pretrial procedures are shown to be improper and the pretrial identification evidence is suppressed, the People then have the burden of proving by clear and convincing evidence that the prospective in-court identification testimony, rather than stemming from the unfair pretrial confrontation, has an independent source.
A pretrial suppression hearing was held before me. From the testimony, I find the following facts:
On July 25, 1984, at approximately 5:25 p.m., Miriam Kaprow, while walking alone near the East Drive, in Central Park near 97th Street, was approached from behind by a man who came around in front of her and demanded her purse. She refused his demand, and began to run. He caught up with her, again demanding the purse. He then grabbed the purse; a brief tugging match ensued, after which he pulled it from her grip and fled.
Ms. Kaprow yelled for help. Police Officer Gillespie, who was on foot patrol in the park, heard Ms. Kaprow and immediately ran to her aid. He was told that she had just had her. purse snatched. He was also given a description of the perpetrator, and told the direction in which he had fled. Officer Gillespie put out a radio call stating that a purse snatching had just occurred at 97th Street on the East Drive. He left Ms. Kaprow and ran north on the East Drive in an attempt to find the perpetrator. He soon came upon a stopped car, the back door of which was open. The man inside said “Get in. They’re up here to the north, they’re driving northbound.” Officer Gillespie got into the car, which headed north. The driver told him that the car in which the presumed perpetrators had fled was a gray Toyota with New Jersey plates bearing the numbers 391. The officers put out a radio call with this information. Shortly afterwards, Officer Gillespie heard a radio transmission indicating that the car had been spotted going south on Fifth Avenue. At 105th Street, he left the vehicle and began walking back towards the complainant. (The name of the driver of the car who furnished the officer with the information was never obtained.) En route, he was met by another officer on a scooter, who then turned the scooter around and provided Officer Gillespie a ride back to Ms. Kaprow.
*205 When he arrived, another policeman was already on the scene. Shortly thereafter, a police car arrived. Ms. Kaprow and Officer Gillespie were taken to 96th Street and Lexington Avenue, arriving within 30 minutes of the incident.
While she was still in the police car, another policeman, Officer Foggy, approached her with a purse and certain other items and asked whether she recognized them. She promptly identified them as having just been taken from her during the robbery. Officer Foggy then told her he wanted her to look at someone. She left the vehicle, and walked slowly past another police vehicle, in the rear of which were seated the two defendants. Ms. Kaprow looked inside as she passed and told Officer Foggy that she recognized defendant Howard as the man who had robbed her.
Howard seeks to suppress testimony concerning this out-of-court identification, contending that the circumstances of the identification were unduly suggestive and hence that the identification was not reliable. While the identification procedures were not entirely free of suggestivity, under the circumstances, particularly the short amount of time that elapsed between the incident and the identification, the procedures employed were proper and the identification reliable.
Although the ideal practice, when feasible, is not to conduct a showup but, rather, to hold a lineup (People v Love, 57 NY2d 1023; People v Adams, 53 NY2d 241), under certain conditions, particularly in the interest of prompt identification, a showup is permissible and even advisable. (People v Love, supra; People v Adams, supra; People v Blake, 35 NY2d 331.) The closer in time and place to the scene of the crime, the less objectionable is the showup. (People v Love, supra.) Here, the identification occurred only (approximately) 30 minutes after the robbery and only 5 or 6 blocks from the scene. Showups under these conditions have consistently been upheld. (See, e.g., People v Love, supra; People v Smith, 38 NY2d 882; People v Logan, 25 NY2d 184; People v Cole, 100 AD2d 442; People v Reyes, 92 AD2d 837; People v Digiosaffatte, 63 AD2d 703.)
The complaining witness viewed Howard, and identified him while he was in custody, in a police car. In that situation, the police officers’ belief that one or both of the individuals in the car had committed the robbery was apparent. (See, People v Adams, supra; People v Dolphin, 77 AD2d 571.) This alone, however, does not negate the reliability of an otherwise proper showup, especially where, as here, no remarks are made by the officers to *206 exacerbate any potential suggestiveness. (People v Smith, supra, at p 882.)
A more serious question arises over the propriety, prior to the showup, of asking Ms. Kaprow whether she recognized certain articles which had been recovered from the suspects. This question appears to be one of first impression in New York.
Once Ms. Kaprow had identified the articles as her own, it required no great powers of logic to discern that the two individuals whom she was about to view were those from whom the articles had been taken. Hence, there is some danger that the ensuing identification was based to some degree upon reasoning rather than recognition. The court, in evaluating the reliability and admissibility of an identification, examines the witness’ recollection and recognition of an individual from the scene of the crime, based upon such factors as lighting conditions and the length of time the witness was able to view the perpetrator. A crime victim who is taken by the police to view certain individuals, or even to a police station to view a lineup, will deduce that the police believe they have found the perpetrator. It is probably evident to every victim in such circumstances that at least one of the people she is being asked to view is believed to be the perpetrator. Thus, although showing Ms. Kaprow the items recovered, reinforced this obvious belief, it did not create it. In the real world outside the courtroom, common sense would dictate to the witness that the police were not merely taking her on a casual drive to Lexington Avenue, but rather that they had a serious purpose in mind.
Notwithstanding that the procedures may not have been ideal, the court concludes that the identification which occurred here was not unduly suggestive or unreliable.
No case in point has been found in this jurisdiction. In Boyd v State (168 Ga App 246, 308 SE2d 626 [1983]), when the complaining witness arrived on the scene to make an identification, she saw on the hood of a car certain items which she recognized as having just been taken from her house. She then identified the two suspects in custody as the men who had been inside her house. The Georgia Court of Appeals upheld the admissibility of the identification testimony because the showup was conducted as soon as possible after the offenses occurred and defendants had been apprehended. (And see, United States ex rel. Frizer v McMann, 437 F2d 1309 [1970].)
A final point warranting discussion is the proposition that once Ms. Kaprow had identified the stolen items and the police had custody of the suspects from whom they had been obtained, *207 some of the exigencies which ordinarily justify a showup had been dissipated (see, People v Blake, supra). Exigencies, however, are not necessarily required in order to exempt an identification viewing from the Wade-Gilbert rules (United States v Wade, 388 US 218; Gilbert v California, 388 US 263) which are designed to insure fair and reliable identification procedures. The Court of Appeals has stated “that in addition to exigencies which would exempt prearraighment viewings * * * ‘viewings on the scene and immediately after the commission of the crime’ are similarly exempted.” (People v Smith, supra, at p 883; see also, People v Digiosaffatte, supra, at p 703.) This exemption applies here.
One of the advantages of a prompt identification viewing is the freshness of the witness’ memory; the strength of the memory is directly related to the passage of time between the initial visual impression and the subsequent viewing (People v Blake, supra, at p 337; Russell v United States, 408 F2d 1280). Delay can impair a witness’ ability to recall. Also, if the suspect in custody is not identified as the perpetrator, an innocent person may be released with a minimum of delay. The longer the delay in arranging the identification viewing (ideally, a lineup), the longer that a potentially innocent suspect, who might otherwise be quickly exonerated, must remain in custody. (People v Blake, supra.)
Furthermore, if Ms. Kaprow had said that Howard was not the person who robbed her, the police were still in a position to continue the search for the perpetrator. The showings here took place when the crime was still so fresh that a continuing search might have revealed the perpetrator, if Howard was not identified, and thus was determined to be innocent of this crime.
In this case, Ms. Kaprow positively identified her belongings, which had been taken from the suspect by the police. The likelihood that these men (or at least one of them) had committed the robbery was obvious. While the police had strong reason to believe the correct men had been apprehended, under the circumstances, it was not improper as an added precaution and for added assurance to have Ms. Kaprow view the suspects. From a practical point of view, in the few seconds which it would take to have Ms. Kaprow view the suspects, the police would be able to assure themselves that they had the right suspects, or, on the other hand, know whether they were mistaken. It would have been unrealistic and impractical to require a lineup in that situation. The court notes that lineups, of necessity, take much more time to arrange. Conducting the showup while the visual *208 image was still fresh in the victim’s mind, rather than delaying and allowing that image to fade, was the proper course of action.
In short, the court does not find the identification procedures employed by the police to have been improper. The proximity in time and place of the crime to the identification assured its reliability.
The motion is denied.
The foregoing constitutes the opinion, decision and order of the court.