547 So.2d 131 (1989)
STATE of Florida, Petitioner,
v.
Sylester Earl SMITH, Respondent.
No. 70261.
Supreme Court of Florida.
July 27, 1989.
*132 Robert A. Butterworth, Atty. Gen., and Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, for petitioner.
Bruce D. Lincoln, Ft. Lauderdale, for respondent.
BARKETT, Justice.
We have for review Smith v. State, 501 So.2d 657 (Fla. 4th DCA 1987), which certified the following question of great public importance:
WHETHER, PRIOR TO THE INITIATION OF FORMAL ADVERSARY JUDICIAL PROCEEDINGS IN THE FORM OF AN INDICTMENT OR INFORMATION, AN ACCUSED HAS A CONSTITUTIONAL RIGHT TO COUNSEL AT A COMPELLED LINEUP?[1]
Id. at 658. Because of the particular facts of this case, we rephrase the question as follows:
MUST EVIDENCE BE SUPPRESSED THAT WAS OBTAINED THROUGH AN EX PARTE ORDER COMPELLING AN ACCUSED ALREADY IN POLICE CUSTODY TO PARTICIPATE IN A POLICE LINEUP?
We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We find that the due process clause of the Florida Constitution forbids a lineup conducted under these circumstances. Accordingly, we answer the rephrased certified question in the affirmative and approve the result reached below. See art. I, § 9, Fla. Const.

I.
Around 1:00 on the morning of February 28, 1983, two men held up a convenience store at gunpoint, absconding with cash, money orders, and various other items. One man entered the store, bought a few items, and left. As he left, the second man entered and proceeded to rob the store clerk, Seepersaud Schive Charan. Charan immediately reported the robbery and gave a description of both men and their car to the police. The man who did the taking was described as "between 140, 180 pounds, 5 feet 6 inches to 6 feet, black male, 23-25 [years old]." A few minutes after the police alert, an officer spotted two men at a nearby apartment building walking away from a car that fit the description of the car used in the robbery. The officer followed one of the men up some stairs and returned him to the parking lot where Charan identified him as the man who had first entered the store. The man Charan identified was not Respondent, Sylester Earl Smith ("Respondent"), but rather Sylvester Smith ("SylVester"), Respondent's brother.[2]
The next day, Terry Lamar Green was arrested in connection with the robbery after he tried to cash one of the stolen money orders. Two days later, Charan identified Green from a photo display as the second robber, the man who actually did the taking. Charan now described the second robber as 5 feet 6 inches tall and 145 pounds, a description that fit Green.[3] Based upon the photo identification and description, Sergeant Carroll, the detective in charge of the robbery, initiated the filing of a robbery charge against Green. In the meantime, however, SylVester had been questioned by the state attorney and had placed the blame for the robbery on his brother, Respondent. Green was then released and Respondent arrested.
On March 15, Respondent appeared before the county court for a first appearance *133 hearing. The record indicates that counsel was not appointed at that proceeding and contains a notation that Respondent would retain his own attorney. After this hearing, Respondent was asked to stand in a lineup but he refused. On March 24, without notice to Respondent, the state's attorney obtained an ex parte court order compelling Respondent's appearance at a lineup on that same day. Respondent was not represented by counsel at the hearing on the state's motion to compel.
After obtaining the order to compel, the state's attorney advised the public defender's office that a lineup was going to be held but was told that Respondent had his own attorney. Respondent stated prior to the lineup that he did not know who his attorney was. The lineup was conducted without counsel and Charan picked Respondent. After the lineup, Charan was deposed. He now described the robber as about 5 feet 7 inches tall and weighing 185 pounds, a description which fit Respondent. On March 28, an information was filed formally charging Respondent with the robbery.
Prior to trial, Respondent filed a motion to suppress the lineup identification. At the suppression hearing, Sergeant Carroll testified that prior to the lineup, he told Charan there was a new suspect and the person Charan had picked out from the photographs would not be in the lineup.[4] Charan, however, denied he was told there was a different suspect for the live lineup. Sergeant Carroll also testified that immediately after the lineup, Charan said he had recognized Respondent by the wide scar on his right arm. The trial court denied the motion, finding that no constitutional rights had been violated.
At trial, the state's evidence against Respondent consisted of the testimony of Charan and Sergeant Carroll relative to the lineup identification, Charan's in-court identification, and SylVester's testimony. Sergeant Carroll repeated his pretrial testimony except this time he equivocated as to whether he had told Charan that the police had a new suspect for the live lineup. Charan again stated that he had not been told that the lineup would not include the person he had identified in the photo display. When Charan identified Respondent in court, he pointed out the scar on Respondent's arm, stating that he saw the scar at the robbery. He denied seeing the scar at the lineup.
According to SylVester, who testified in exchange for a recommendation of probation on the same charge, he and Respondent went to the store to get beer. Although he knew Respondent intended to rob, SylVester said he did not. He went into the store twice, to buy something and then to get some change. After he got the change, Respondent told him to leave and he drove to their apartment a few blocks away. He returned a few minutes later and found Respondent hiding in some bushes between their apartment and the store.
In its case, the defense introduced the photo display from which the store clerk had selected the picture of Terry Lamar Green as the second robber.
The jury found Respondent guilty as charged. After the verdict but prior to sentencing, Respondent submitted to the trial court the results of a polygraph examination he had taken on October 16, 1983, showing that he did not commit the robbery in question. He also requested a new trial based upon the fact that yet another brother, Billie Joe Smith, who also fit the description of the robber given by Charan at trial, had been arrested and charged with robbing another convenience store later the same day, in the same vicinity, and with a similar method of operation. That motion was denied.
On appeal, the Fourth District reversed the trial court but certified the case as involving a question of great public importance. Smith, 501 So.2d at 658.

*134 II.
One of the most fundamental principles of Anglo-American jurisprudence is the guarantee of due process. The concept was first articulated in a written legal document in article 39 of Magna Charta[5] when promulgated by King John of England on June 15, 1215. Since that time, the concept of due process has been embodied in every great charter produced by modern Western democracies. Both the fifth and fourteenth amendments of the federal Constitution, as well as article I, section 9 of the Florida Constitution, embody the concept and make it binding upon the courts of Florida. It is one of the central tenets of the organic law of this state, and one that restricts the power of all three branches of government. As a concept rooted in the Anglo-American tradition of ordered liberty, due process is a transcendent principle of both natural and positive law, against which even the enactments of the legislature or the pronouncements of the courts will be measured.
Due process rests primarily on the concept of fundamental fairness. On several occasions we have cited with approval the statements made by Daniel Webster in Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 580-582, 4 L.Ed. 629, 645 (1819) (cited with approval in State ex rel. Munch v. Davis, 143 Fla. 236, 196 So. 491 (1940), and Fiehe v. R.E. Householder Co., 98 Fla. 627, 125 So. 2 (1929)), where he said that due process
hears before it condemns; ... proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society.
Elsewhere, we have stated that
"[t]he essential elements of due process of law are notice, and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case... . [I]t is a rule as old as the law that no one shall be personally bound until he has had his day in court, by which is meant, until he has been duly cited to appear, and has been afforded an opportunity to be heard. Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression and can never be upheld where justice is fairly administered."
Fiehe, 98 Fla. at 636, 125 So. at 7 (quoting 6 R.C.L. 446 (1915)). Due process, then, embodies at least two general concepts: the right to adequate advance notice and a meaningful right to be heard before a tribunal takes action.
The proceedings that resulted in Respondent's compelled participation in this police lineup offend both of these concepts. At Respondent's first hearing, he indicated that he would retain his own attorney. Consequently, no attorney was appointed by the court. After this initial hearing, Respondent refused to participate in a police lineup. Over a week later, the trial court at the instance of the state entered an ex parte order compelling Respondent to participate in a lineup. Respondent received no notice of the hearing or of the state's motion to compel. Since he had not yet retained counsel, he was unrepresented before the court. Thus, he was precluded from expressing his objections to the lineup procedure in any meaningful manner. Indeed, this ex parte procedure did not even afford Respondent an opportunity to explain whether he was having difficulty obtaining private counsel.
We cannot countenance an ex parte court hearing requesting a lineup against a criminal defendant already in custody. Such a procedure offends the most basic concepts of due process and ordered liberty embodied in article I, section 9 of the Florida Constitution. Thus, the compelled lineup conducted in this instance was unconstitutional. Art. I, § 9, Fla. Const. Any consequences flowing from the unlawful lineup were fruit of the poisonous tree and should have been suppressed at trial. See Caplan v. State, 531 So.2d 88 (Fla. 1988), cert. denied, *135 ___ U.S. ___, 109 S.Ct. 1577, 103 L.Ed.2d 942 (1989).

III.
We now address the legal consequences of the unconstitutional lineup. For this limited purpose, we adopt the principles enunciated in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), which we find to be applicable to the violation of Florida due process law that occurs in ex parte proceedings of this type. We address separately the lineup identification and the in-court identification.
Under Gilbert, evidence of an unconstitutional pretrial lineup identification is per se inadmissible. If admitted, the accused is entitled to a new trial unless the state carries its burden of showing on appeal that the error was harmless beyond a reasonable doubt. 388 U.S. at 274, 87 S.Ct. at 1957. We believe the harmless error standard employed by Florida under State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), should be the proper method of gauging this question. DiGuilio requires the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error did not contribute to the verdict, or alternatively, that there is no reasonable possibility the error contributed to conviction. Id. at 1135.
We cannot find the error harmless in this case. Other than the identification testimony, the only evidence against Respondent was the codefendant SylVester's testimony. There was no physical evidence to corroborate Respondent's participation in the robbery. In fact, the stolen money orders were found on Terry Green, the first man identified. The fact that SylVester agreed to testify in exchange for a plea agreement and also apparently in order to get out of jail casts considerable doubt upon his credibility.
The lineup evidence unquestionably bolstered Charan's in-court identification Given Charan's prior identification of someone else and the suspect nature of the codefendant's testimony, we believe there is a reasonable probability that the improper lineup evidence "contributed to the conviction." DiGuilio, 491 So.2d at 1135. Respondent thus is entitled to a new trial.
At Respondent's new trial, the burden will be on the state to establish by clear and convincing evidence that Charan's in-court identification rested upon his observations during the robbery, independent from and untainted by the unconstitutional lineup.[6]Wade, 388 U.S. at 240, 87 S.Ct. at 1939. If the state fails to meet its burden, Charan will not be permitted to identify Respondent.
For the foregoing reasons, the result reached below is approved.
It is so ordered.
OVERTON, SHAW, GRIMES and KOGAN, JJ., concur.
EHRLICH, C.J., concurs in result only.
McDONALD, J., dissents.
NOTES
[1] Certified by order of the court dated February 19, 1987.
[2] The names are confusing. Respondent's name, Sylester, does not have the "v" which his brother's name has.
[3] The photograph showed Green only from the neck up.
[4] Because it is not essential to the disposition of this case, we do not reach the question of whether the lineup procedures used in this instance was unduly suggestive and therefore inadmissible.
[5] Article 39 required that no person could be subjected to a loss of rights except according to the law of the land. C. Holt, Magna Charta 326-27 (1965).
[6] In United States v. Wade, 388 U.S. 218, 241, 87 S.Ct. 1926, 1939-40, 18 L.Ed.2d 1149 (1967), the Supreme Court outlined a number of factors to be considered in making this determination: the prior opportunity the witness had to observe the alleged criminal act; the existence of any discrepancy between any pre-lineup description and the defendant's actual description; any identification prior to the lineup of another person; any identification by picture of the defendant prior to the lineup; failure to identify the defendant on a prior occasion; any time lapse between the alleged act and the lineup identification; and any other factors raised by the totality of the circumstances that bear upon the likelihood that the witness' in-court identification is not tainted by the illegal lineup and does, in fact, have an independent source. We adopt this nonexclusive list of factors as a matter of Florida law in gauging errors of the type involved in this case. Art. I, § 9, Fla. Const.