CIACCIO, Judge.
Defendant, Walter Washington was charged with simple burglary of an inhabited dwelling. La.R.S. 14:62.2. Following a lunacy hearing he was found sane to stand trial. A jury convicted him as charged. *284 He was sentenced, on this charge, as a second offender, to serve eight years at hard labor, the first year to be without benefit of parole, probation, suspension of sentence, or good time. We affirm.
The victim of this residence burglary, Thomas Sims Hughes, resides in a basement apartment located at 336 Walnut Street in New Orleans. The upper apartment located at 332 Walnut is occupied by Brian Frilot. On the evening of April 9, 1986 at approximately 8:25 p.m. Mr. Hughes and a friend who was visiting him, Ms. Julie Burg, went in the rear of the apartment and were listening to music. A glass was broken in the front of the apartment and the front door opened. The sound of the breaking glass was heard by Brian Frilot from his upstairs apartment but was not heard by Mr. Hughes nor Ms. Burg. Mr. Frilot walked out his front door and called to his neighbors in the downstairs apartment. An individual, later identified as the defendant, stepped out from underneath the landing. The subject was carrying an object in his left arm and raising his right arm, he warned Mr. Frilot to “get back inside ...” Thereupon, Mr. Frilot stepped back, opened his front door slowly and stepped inside. As Mr. Frilot closed the door he heard the sound of gunshot and instructed his wife to call the police. Mr. Frilot, fearing his neighbor may have been injured, armed himself with a shotgun and went downstairs.
As Mr. Frilot arrived downstairs he found the broken glass and the front door open. He opened an interior door to the apartment and found its occupants who had been unaware of the earlier events. Mr. Frilot advised them that someone had broken into the apartment. Missing from the apartment were Mr. Hughes’ briefcase and a set of door keys, Ms. Burg’s purse which contained, among other things, a wallet, keys and jewelry.
Shortly thereafter the police arrived. They were informed by Dr. Richard Brunswick, a resident of 353 Walnut Street, that he had been walking his dog when he heard a gunshot and saw a man run across the street. Dr. Brunswick watched as the subject ran up another street, met a man standing on the corner and they ran down Prytania Street towards Broadway. Since Dr. Brunswick was not wearing his glasses, he could not identify the subject.
The police, with Brian Frilot in their car, then followed the path in an attempt to find the subject. During their ride Mr. Frilot spotted the subject on Millaudon Street. The officers disembarked and the defendant started to pull a steel revolver from his waistband. The officers pulled their revolvers and the defendant dove behind a car. The police ran around the car and the defendant jumped up, threw his hands in the air and yelled to the officers not to shoot him. The officers patted down the defendant. Near a parked car adjacent to the scene the officers found a blue steel revolver lying on top of a blue and white purse. The purse was later identified as belonging to Ms. Burg. At this time, Mr. Frilot again identified the subject as the individual he saw at his neighbor’s residence.
Officer Bruce Harrison, who was accompanied by Officer Louis Dabdóub at this time, advised Walter Washington of his rights. When Washington’s responses were “inaudible” sounds, Harrison realized that the defendant had a problem and the defendant’s mother was summoned to the scene. It was later discovered that the defendant was deaf and he utilized a hearing aid. Once his mother arrived on the scene she advised the police that her son understood their questions and advice of his rights.
Following the defendant’s arrest, the police retraced the route they believed he had taken from the Walnut Street residence. Along the route they found Hughes’ brief case and various items belonging to Ms. Burg, including identification, a wallet and a green bag.
Thereafter a follow-up investigation of the Walnut Street residence revealed a spent bullet which was retrieved from the wall.
At trial various alibi witnesses were presented by the defense.
*285 Leo Harris and Troy Taylor testified that they had played basketball with the defendant until 8:15 p.m. The defendant told them he was going home.
Anita Davis testified that the defendant ate crawfish in her yard on the night of the crime. As he left through her gate the police confronted him. This was corrabo-rated by Lorraine Gray.
The defendant’s mother, Ellen Carrierre, testified that Mark Payne admitted that he fired the gun in this incident and he asked Ms. Carrierre not to tell his mother that Anita Davis saw him running near the crime scene on the night in question.
Each defense witness testified that the defendant, as a result of being deaf, spoke with an impediment.
In his sole assignment of error in this case, the defendant contends the trial court erred when it ruled that if the defendant presented a voice exemplar for the jury that he would thereby subject himself to cross-examination. As a result of the ruling the defendant did not present the exemplar and he now argues that this prejudiced his defense. The defendant sought to demonstrate his speech impediment and thereby prove misidentification in that he could not have clearly ennunciated the two statements attributed to him during the events of the crime.[1]
The defendant relies upon State v. Tillett, 351 So.2d 1153 (La., 1977) to support his contention that the trial court erred in its ruling. In Tillett, supra, the State placed the defendant’s voice at issue. One victim of the robbery testified that the defendant spoke with a Spanish accent and this, in addition to certain physical characteristics, caused him to identify Tillet as the perpetrator of the crime.
In holding that the trial court erred in its ruling that Tillett’s voice demonstration would waive his privilege against self incrimination, the Louisiana Supreme Court found as follows:
On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling ‘communications’ or ‘testimony.’ but that compulsion which makes a suspect or accused the source of ‘real or physical evidence’ does not violate it.” [Schmerber v. California], 384 U.S. [757], 763-64, 86 S.Ct. [1826], 1832 [16 L.Ed.2d 908] (1966). (citations omitted) (emphasis added)
This distinction between an act which communicates and an act which merely makes an accused’s physical characteristics the subject of evidence has been consistently applied in fifth amendment analysis. In Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the United States Supreme Court held that the state’s taking of a handwriting exemplar did not violate the accused’s fifth amendment privilege. The Court stated that:
“One’s voice and handwriting are/ of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection.
* * * * * *
On the same day that Gilbert was handed down, the United States Supreme Court likewise held that the fifth amendment privilege against self-incrimination was not violated when the state required the defendant accused of a bank robbery to utter the words used by the robber. United States v. Wade, 388 U.S. 218, 87 *286 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The Court ruled that “compelling Wade to speak within hearing distance of the witness, even to utter words purportedly said by the robber, was not compulsion to utter statements of a ‘testimonial’ nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt.” 388 U.S. at 222-23, 87 S.Ct. at 1930.
[[Image here]]
In Louisiana we have similarly allowed the state to compel a criminal defendant to exhibit his physical make-up, including his voice, without finding an infringement of his privilege against self-incrimination.
⅝ sfc sj< * sfc ⅛
Since the state could have compelled defendant to display the quality of his voice without infringing on his fifth amendment privilege, his offering to make such a demonstration could not have constituted a waiver of his privilege against self-incrimination. Waiver of the privilege is accomplished, in the case of a criminal defendant, when he voluntarily takes the stand to testify in his own behalf. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937); Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926); State v. Smith, 283 So.2d 470 (La.1973). Once a defendant knowingly and intelligently waives his privilege, he is of course subject to cross-examination on the whole case like any other witness. La.R.S. 15:462. However, defendant Tillet’s request to reveal a physical characteristic would not have been testimony in his behalf, but merely a voice recital for the purpose of revealing a physical characteristic as evidence in the case. United States v. Wade, supra; United States v. Dionisio, supra; State v. Lacoste, supra; State v. Jones, supra. Therefore, his proposal to demonstrate his accent, or lack of it, did not waive his fifth amendment rights and make him liable to cross-examination. It has long been held that one of the essential ingredients of due process is reciprocity, see Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), and we hold that if the state can compel a criminal defendant to demonstrate his physical characteristics before the jury without infringing on his fifth amendment rights, a defendant’s offer of such a demonstration does not constitute a waiver of that same right. State v. Tillett, supra at 1155-1157.
As such, in the present case, we find the trial court erred in ruling that the defendant’s presentation of a voice exemplar would waive his privilege against self-incrimination.
The more difficult issue is whether this error was prejudicial thereby warranting a reversal of the defendant’s conviction.
In the present case, unlike Tillett, supra, the identification of the defendant was not based on the prohibited evidence. In Til-lett one of the two people who identified the defendant did so on the basis of “his forehead, his eyes and his Spanish accent" (Emphasis added). By contrast, the State’s case here was not based merely on witness identification. In this case the defendant was found in possession of a gun and was arrested with stolen merchandise at his feet. Additionally, Dr. Brunswick saw the perpetrator’s path which led directly to the defendant and discarded stolen property was found along this path.
Moreover, the witnesses in this case did not give a description of the perpetrator’s voice to the police, rather, the defendant was identified by his clothing and physical appearance.
Accordingly, although we find the trial court’s ruling to be error, because of the additional evidence presented against the defendant, we find this error to be harmless.
For the reasons assigned the defendant’s conviction and sentence are affirmed.
AFFIRMED

. The defendant was alleged to have told Mr. Frilot "get back inside, mother fucker” and the arresting officers were told "Don’t shoot me."